43   137
88   488
89   162
43   137
98   128
98   432

[No. 2,988.]

# THE PEOPLE OF THE STATE OF CALIFORNIA *v.* LAURA D. FAIR.

CRIMINAL LAW—DISQUALIFICATION OF JUROR NOT GROUND FOR NEW TRIAL.—The fact that a juror had formed and expressed an unqualified opinion of the guilt of the accused, is not, under our practice, ground for a new trial, when the objection is taken for the first time after the trial, upon affidavits showing disqualification.

CRIMINAL PRACTICE ACT, SECTION FOUR HUNDRED AND FORTY—GROUNDS FOR NEW TRIAL.—Section four hundred and forty of the Criminal Practice Act, which declares what shall be grounds for new trial, and uses the words "in the following cases only," clearly excludes all other grounds whatsoever.

PEOPLE V. PLUMMER, 9 CAL. 298, OVERRULED—In so far as it holds that an objection to the competency of a juror, taken for the first time after verdict, may be availed of on motion for new trial.

TRIAL FOR MURDER BY A MISTRESS—DEFENDANT'S GENERAL CHARACTER FOR CHASTITY.—Where, on the trial of a woman for the murder of a man, with whom she had been having unlawful intercourse, defendant's

CAL. REPS. XLIII—18

counsel took the ground that her prospects had been ruined by the acts of the deceased, and introduced testimony tending to show, and for the purpose of showing, that fact; and, in view of such position taken by counsel and the testimony offered by him, the prosecution was allowed in rebuttal to prove, against defendant's objection, that her general character for chastity was bad: *Held*, error.

MURDER TRIALS—GENERAL CHARACTER OF ACCUSED NOT INVOLVED.— On a trial for murder proof of the general character of the accused is not received, even on his own behalf—the inquiry in such cases being confined, when pertinent at all, to the general character as to the trait involved in the offense charged.

TRIAL OF WOMAN FOR MURDER—WHEN HER GENERAL CHARACTER FOR CHASTITY MAY BE ATTACKED.—The general character for chastity of a female charged with the murder of a man is no more necessarily involved in the question of her guilt or innocence than her general character in any other respect; and on the trial of such a person the prosecution will not be allowed to introduce testimony upon the point, unless the defendant initiate the inquiry.

PRESUMPTION OF GOOD CHARACTER—PROOF OF GENERAL BAD CHARACTER FOR CHASTITY.—The fact that the defense made by a woman charged with the murder of a man is rendered more formidable, when considered in connection with the good character which the law presumes her to possess, does not of itself open the door for the prosecution to prove that her general character for chastity is bad.

ACCUSED PERSONS ENTITLED TO PRESUMPTION OF CHARACTER OF ORDINARY FAIRNESS.—The presumption of a character of ordinary fairness, with which the law for the purposes of trial clothes a person accused of crime, is one to which he is entitled and which cannot be put in peril, unless he, by introducing testimony in reference thereto, elects to put it distinctly in issue.

ARGUMENTS ON MURDER TRIAL—IF PROSECUTION OPEN, RIGHT OF DEFENSE TO CLOSE.—On a murder trial, where two counsel on each side argue the case, they must speak alternately; and if the prosecution open, the defense has the right to the close; and it is error to refuse an application for leave to do so.

CONSTRUCTION OF CRIMINAL PRACTICE ACT, SECTIONS THREE HUNDRED AND SIXTY-TWO, THREE HUNDRED AND SIXTY-THREE, AND THREE HUNDRED AND SIXTY-FOUR.—The amendments of 1854 to sections three hundred and sixty-two and three hundred and sixty-three of the Criminal Practice Act, providing that in criminal trials the prosecution must open and may conclude the argument, but that this order may by permission of the Court be departed from (Stats. 1854, p. 169), do not change the rule, prescribed in section three hundred and sixty-four, that in murder cases the accused has a right to be heard by two counsel, and that if the case be argued by two counsel on each side in addressing the jury, counsel shall do so alternately.

ARGUMENTS IN MURDER TRIALS—DISCRETION OF COURT AS TO WHO
TO OPEN.—Under section three hundred and sixty-three of the Criminal
Practice Act, as amended in 1854 (Stats. 1854, p. 169), the Court in a capital
case may, in its discretion, direct by which side the argument to the jury is
to be opened; but by whichever side it is thus opened, the other side, under
section three hundred and sixty-four, will have the close.

APPEAL from the District Court of the Fifteenth Judicial
District, City and County of San Francisco.

The defendant was indicted by the Grand Jury of the
City and County of San Francisco for the murder of Alex-
ander P. Crittenden, on the evening of November 3d, 1870.
The facts of the homicide are briefly, that Crittenden, on
the afternoon of that day, left his residence, in San Fran-
cisco, and went to Oakland for the purpose of meeting his
wife, son, and daughter, who were on their way from the
Eastern States.   He met them at the wharf, went with
them on the steam ferryboat "El Capitan," and sat down,
between his wife and daughter, on the deck.   In a few
minutes after the steamer left the Oakland wharf, on her
way to San Francisco, Laura D. Fair, the defendant, closely
veiled, stepped in front of Crittenden, drew a pistol, and
exclaiming, "You have ruined me and my child," fired at
him.   The ball took effect in his left breast, inflicting a
mortal wound, of which he died on November 6th follow-
ing.   Mrs. Fair, after the fatal shot, ran into the cabin of
the steamer, and mingled among the rest of the passengers,
but was soon afterwards arrested; and being accused of the
murder, she replied: "Yes, I don't deny it; I admit that I
shot him; I don't deny it.   He has ruined me and my child.
I was looking for the clerk to give myself up.   Take me;
arrest me; I am ready to go with you."

The indictment having been transferred to the District
Court of the Fifteenth Judicial District, and the accused
having been arraigned, and pleaded "not guilty," the trial
commenced on March 27th, 1871.   It continued until April

26th, 1871, upon which day, after a short retirement, the jury returned a verdict of "Guilty of murder in the first degree." The defendant subsequently moved for a new trial, upon numerous points and exceptions, among which were the points of objection discussed in the opinion of this Court. The motion for new trial being denied, and defendant sentenced to be hanged, she took this appeal from the judgment and order.

*E. Cook* and *L. Quint*, for Appellant.

I. The Court below should have granted a new trial, on the ground that the juror Beach was incompetent, on account of having formed and expressed an unqualified opinion as to the guilt of the defendant. (*People* v. *Plummer*, 9 Cal. 372; *State* v. *Hopkins*, 1 Bay. R. 372; *Sellers* v. *The People*, 3 Scammon, 412; *U. S.* v. *Freis*, 3 Dallas, 515; *Busick* v. *The State*, 19 Ohio, 198; *Wade* v. *The State*, 12 Geo. 25; *Cady* v. *The State*, 3 Howard, 27 ; *McKinley* v. *Smith*, Strange, 645; *Bishop* v. *The State*, 9 Geo. 121; 2 Graham and Waterman on New Trials, 374, et seq.; *Wellman* v. *Hulbert*, 2 Clief, 45; *McKinley* v. *Smith*, Harding's R. 167; *Monroe* v. *State*, 5 Geo. 139.) It is contended, it is true, that we cannot reach the incompetency of Beach as a juror on motion for new trial; that no matter what his prejudices may have been—no matter if by perjury of the most deep and damning character he had stolen into the jury box, and thus imposed upon the defendant, yet she is remediless. She must abide the consequences, and forfeit her life, and why? Because the statute does not, in express terms, point out this particular ground as one to be used upon motion for a new trial. No single case, however, has been cited in support of this proposition, while we have cited above, a number directly to the contrary.

II. The general reputation or character of the defendant for chastity, or want of chastity, was clearly inadmissible.

She was not on trial for her chastity, virtue, or moral character. Her character was not in any aspect of the case in issue. She was being tried for her life. She, and she alone, could have put her character in issue. (Wharton's Am. Crim. Law, Secs. 636, 637, 638, 824; *State* v. *O'Neil*, 7 Iredell, 251; *Dewitt* v. *Grunfield*, 5 Ohio, 227; *Com.* v. *Hopkins*, 2 Dana, 418; *Fausier* v. *State*, 14 Miss. 386; *Com.* v. *Webster*, 5 Cush. 325; *Carter* v. *Com.* 2 Virg. Ca. 169; *Griffin* v. *State*, 14 Ohio, 55; *State* v. *Creson*, 38 Missouri, 372; *People* v. *White*, 14 Wend. 111; *Ackley* v. *The People*, 9 Barb. 609; *People* v. *Bodine*, 1 Dana, 282; Roscoe's Crim. Ev. 94.) Omission to produce evidence of good character was no presumption that her character was bad. (Wharton's Amer. Crim. Law, Secs. 641, 668; *People* v. *McCauley*, 10 Cal. 309; *People* v. *White*, 24 Wend. 520; *People* v. *White*, 14 Wend. 111; *Williams* v. *State*, 19 Geo. 402; *State* v. *Howson*, 26 Miss. [5 Jones], 431; *Com.* v. *Stewart*, 1 S. & R. 342; Arch. C. P. 105; *R.* v. *Rejier*, 1 B. & C. 431; *Com.* v. *Hopkins*, 2 Dana, 418; *Overstein* v. *State*, 3 How. Miss. 328.) It is urged, however, that the defendant opened the door to this testimony as to her general character. All that we did was to introduce testimony as to when and where the parties met; that there was a mutual engagement to marry; that this engagement was made months before defendant knew that Crittenden had a wife living; that after she ascertained he was a married man, then, under a promise on his part to procure a divorce and marry her, their intimacy continued up to the very day of his death. This, in brief, is all the testimony introduced on her part, under which, it is claimed, the prosecution had the right to assail her character for chastity, for the purpose of rebutting any presumption that might arise from this proof that her mind became disordered. But that this claim cannot be maintained is shown by the authorities cited.

III. The Court below should have directed the counsel in

the case to argue to the jury alternately, or at least have allowed the defendant's counsel the closing argument. (Criminal Practice Act, Secs. 362, 363, 364.) The Court below was of opinion that the Legislature intended by the amendments of 1854 to sections three hundred and sixty-two and three hundred and sixty-three, to give the prosecution the concluding argument, meaning of course that the amendments effected a repeal by implication of section three hundred and sixty-four; but where, let us ask, is the evidence of any such intention? We submit that none such exists; but that, on the contrary, the plain and irresistible inference to be drawn from the action of the Legislature is that that body never intended to alter the rule prescribed in section three hundred and sixty-four in any case "where the punishment is death." That the Legislature intended to change the general rule of argument in ordinary cases of felony is perfectly manifest; but that it intended nothing more is equally apparent.

*Alex. Campbell,* for Respondent.

I. There was no error in refusing a new trial on the ground of the incompetency of the juror Beach. The Court had no power to grant a new trial for such a reason, because it is not one of the grounds upon which "only" a new trial can be granted. (Criminal Practice Act, Sec. 440.) I am aware that *People* v. *Plummer,* 9 Cal. 372, holds a contrary doctrine; but I submit that in that case the Court committed a palpable error. It seems to have based its action on the idea that the defendant had a constitutional right to a trial by an impartial jury, but seems not to have considered the question whether the Legislature has the power to determine when and how the impartiality of the juror shall be ascertained. Provision is made for the challenges to jurors, and it seems obvious that a challenge cannot be interposed after the completion of the jury. If, however, the Court below had the power

on motion for new trial to investigate the question, its decis-
ion on the conflicting evidence would not be disturbed here.
The affidavits filed by defendant on the point of the juror's
expression of opinion are vague and uncertain, and are fully
contradicted by the juror himself, by proof of his good char-
acter, and by proof that, so far from being anxious to get on
the jury, he endeavored to be relieved from service as a
juror at that term of Court.

II. Was the prosecution entitled, by way of rebutting evi-
dence, to go into the question of the reputation of the accused
for chastity prior to and during her acquaintance with Crit-
tenden, independent of her relations with him?  The ques-
tion is novel, for it arose in a novel case.  The defense set
up by the appellant has no precedent or parallel.  That it
should call for a new application of established principles is
not surprising.  The cases cited by the defense have no rela-
tion to the question here, but are in perfect harmony with
the doctrine for which we contend.  It is claimed on her
part that she had not put her character for chastity in issue.
I answer that she had.  In her testimony she represented
herself as a respectable widow, deceived into a marriage
engagement with a man supposed by her to be single or a
widower, and that lured on by his representations as to his
condition into that belief, she consented to become his wife.
The prosecution had a right to show, as well by circumstances
as by positive evidence, that these allegations were entirely
false.  Crittenden was in his grave and could not directly
contradict her.  But we had a right to show in answer to
these pretenses: First—That she was not a single woman at
the time of the alleged engagement.  Second—That at the
time she alleges that he was living in her house under this·
professed engagement, he was residing with his own wife
within about a block of her house, and that his nights were
spent at home in the society of his wife and family.  Third—
That at the same time she was a woman of notoriously bad

reputation, whom no man pretending to any self-respect, could undertake to marry.

III. In the earlier legislation of this State the defendant in criminal cases was allowed to have the closing argument to the jury. It was found that this practice led to great evils; therefore, in 1854, the Legislature changed the rule, and provided, by an amendment to the Criminal Practice Act, that "the counsel for the people must open and may conclude the argument"—thus entirely reversing the previous order of discussion; and at the same time section three hundred and sixty-three was amended. Section three hundred and sixty-four was evidently intended to be repealed, so far as it provides for the alternate argument, for it is inconsistent with the two preceding sections. Such has been the established and unquestioned construction of the law, as amended, for the last seventeen years, in every District Court of the State, and this Court will not now undertake to disturb it. "The District Attorney must open and may conclude the argument." How is this possible if counsel are to argue the cause alternately? Besides, if as provided in section three hundred and sixty-three, the Court has a discretion in the matter, how can this Court in this case interfere with the exercise of that discretion? At the commencement of the argument the defendant's counsel did not claim to open the discussion. They acquiesced then in the uniform construction of the law, ever since its enactment, and it was too late for them to question it afterwards.

*Jo. Hamilton, Attorney General,* and *D. J. Murphy,* also for Respondent.

By the Court, WALLACE, J.:

The appellant was found guilty in the Court below of the crime of murder in the first degree, in the felonious killing of A. P. Crittenden, and was, thereupon, adjudged to suffer

death. A motion for a new trial having been denied, this appeal is taken from the judgment and from the order denying a new trial.

First—In impaneling the trial jury, Henry M. Beach, being examined as to his qualification to serve as a juror, stated, in substance, that he had read in the newspapers an account of the homicide; that he had not conversed with any one about it; had heard but little said upon the subject; that he had neither formed nor expressed an unqualified opinion as to the guilt or innocence of the prisoner; that his mind was entirely unimpressed upon that point, and that he could give the prisoner a fair trial, etc.; and he was thereupon accepted and sworn as a juror.

A verdict of guilty having been rendered by the jury, the prisoner moved for a new trial on many grounds—among the rest, that Beach was not a competent juror—he having, in fact, as the prisoner alleged, both formed and expressed an unqualified opinion, before he was called as a juror, that she was guilty of murder in killing Crittenden, and that she ought to be executed. Numerous affidavits were produced and read at the hearing of the motion, which tended to show that Beach had, in point of fact, shortly after the killing, openly declared that he considered it a willful murder, and that if he should be upon the jury he would consider that the offense of the prisoner was murder in the first degree, and would hang her. Counter affidavits were also produced and read, going to show that the statements contained in the affidavits, upon behalf of the prisoner, were incorrect and untrue.

The alleged disqualification of Beach to serve as a juror is relied upon here; and it is claimed that in view of the affidavits in the record the Court below should have set aside the verdict on that ground.

CAL. REPS. XLIII—19

We think, however, that in this respect the motion was properly overruled. The right of the prisoner to move for a new trial in a criminal case is given by section four hundred and forty of the Criminal Practice Act, and the grounds upon which such a motion is to be made are therein prescribed and enumerated. The statute declares that such a motion, when made, must be based upon one or more of the grounds in that section mentioned—" *in the following cases only* " is the expression—and it clearly excludes all other grounds whatsoever.

Could the question of practice involved be quite regarded as *res integra* here, this mere reference to the terms of exclusion employed in the statute would be sufficient to dispose of the point; but in *The People* v. *Plummer*, 9 Cal. 298, it was held by this Court that under this statute an objection to the competency of a juror might be made by the prisoner for the first time after verdict rendered, and might be relied upon as a ground of motion for a new trial.

We have carefully examined the elaborate and able opinion rendered in that case, and we find in it nothing whatever as to the construction or interpretation of section four hundred and forty in the particular already referred to. It is undoubtedly true, as there remarked by the Court, that every citizen has the right " to demand that all offenses charged against him shall be submitted to a tribunal composed of honest and unprejudiced men, who will do equal and exact justice between the Government and the accused, and, in order to do this, weigh impartially every fact disclosed by the evidence." The right of trial by jury is unquestionably a sacred right, and one secured by the guarantees of the Constitution; and this is much, if not all, of what is said in the opinion delivered here in the case of Plummer. But when this proposition of constitutional law is conceded, we have advanced but a little way toward the point of practice involved here and in the Plummer case as well. The jurors

should undoubtedly be indifferent, *omni majores exceptione.* But they may not, in fact, be so; and if not, the question is, at what time in the progress of the case, and through what method of procedure, may the prisoner be heard to allege that fact. Undoubtedly, if the fact be known to him, and he make it appear before the juror is sworn, he may interpose a challenge for cause. But if the prisoner do not know the fact of disqualification, or knowing it, is still unable to establish it before the juror is sworn, what step may he subsequently take to avail himself of the objection? May he make it a ground of a motion in arrest of judgment, under section four hundred and forty-two? Certainly not—no one pretends that he could—because the statute itself has undertaken to enumerate the grounds upon which the judgment may be arrested, and the incompetency of a juror not being one of these, the intention to exclude that and all other nonenumerated grounds must be apparent. But in reference to a motion for a new trial, the statute has not only enumerated the grounds upon which it may be made, but has *expressly excluded all others.* A single decision of this Court, in which the provisions of the statute upon the subject, though cited in argument, appear to have been wholly overlooked, cannot prevail against the words of the statute unmistakably expressing the legislative intent. The case of *The People* v. *Plummer*, in so far as it holds that an objection to the competency of a juror, taken for the first time after verdict rendered, may be availed of on motion for new trial, is therefore overruled.

Second—The evidence of the defense having been concluded, the prosecution were permitted, against the objection of the prisoner, to prove that her general character for chastity was bad.

The nature of the charge against the prisoner certainly did not *per se* involve an inquiry into her character for chastity. A good reputation for that virtue, had it been

hers, and had she even offered to show, as part of her defense, that she possessed that reputation, must have been excluded upon objections of· the prosecution, inasmuch as it involves a trait of character not in the slightest degree involved in the alleged commission of the crime with which she stood charged. It is inexact to say that proof of the general character of the prisoner is received, even on his own behalf, in Courts of common law, in trials for felonious homicide. The inquiry in such cases is confined to the general character as to the trait involved in the offense charged. The chastity, or general character for chastity, of a female charged with the commission of such an offense, is no more necessarily involved thereby than is her general character for honesty of dealing in pecuniary transactions. The rules of evidence in criminal cases limit the inquiry to the characteristic impugned in the alleged commission of the offense under investigation.

Mr. PHILLIPS, in his work on evidence, expresses the true rule upon this subject, and which will be found to accord with the current of judicial decisions, and the opinions of the text writers upon the law. He says: " On a charge of stealing it would be irrelevant and absurd to inquire into the prisoner's loyalty or humanity; on a charge of high treason, it would be equally absurd to inquire into his honesty and punctuality in private dealings. Such evidence relates to principles of moral conduct, which, however they might operate on other occasions, would not be likely to operate on that which is alone the subject of· inquiry. It would not afford the least presumption that the prisoner might not have been tempted to commit the crime for which he is tried, and is, therefore, totally inapplicable to the point in question." (Page 490.) It is apparent that if such an inquiry must, upon objection by the prosecution, have been excluded for mere irrelevancy, had the prisoner sought to introduce it in her own behalf, the same rule

should have rejected it when tendered by the prosecution itself.

Supposing, however, that an investigation upon that point, or upon any other given point of the general character of the prisoner, had been pertinent in itself, it is, nevertheless, settled by an overwhelming current of judicial decisions that it is not competent to the prosecution to initiate the inquiry, and that it is only after the prisoner has elected to put his character in issue, by calling witnesses and adducing evidence in its distinctive support, that the prosecution is permitted to follow and disprove the evidence so offered, if it can. Nor is the prisoner to be held to have thus led the way, and opened up her character to the attack of the prosecution, merely because the case made or attempted in the defense is rendered more formidable when considered in connection with the good character—good in the sense of not being bad—which the law assumes the prisoner to possess in cases in which no evidence upon the subject of general character is offered. The presumption of a character of ordinary fairness, with which the law clothed her for the purposes of the case, was one to the benefit of which she was entitled, and which could not be put in peril unless, discarding the presumption thus afforded her, she had elected to put it distinctly in issue, and so constitute it a fact to be determined by the jury as other facts in issue were to be determined.

"Whenever the defendant chooses to call witnesses to prove his general character to be good, the prosecution may offer witnesses to disprove their testimony. But it is not competent for the prosecution to go into the inquiry until the defendant has voluntarily put his character in issue." (*Comm.* v. *Hardy*, 2 Mass. 317.)

"A prisoner on trial may show what his reputation is, and then the question is open to the prosecution, and for the jury

to determine like other controverted facts." (*People* v. *Bodine*, 1 Denio, 314.)

We have remarked already that the defense called no witness to establish the general character of the prisoner, and when she objected to the attack of the prosecution in that respect, the learned Court below said: "It is very certain that in the opening of the case the counsel for the defendant took the ground that the prisoner's prospects had been ruined by the acts of Mr. Crittenden. The evidence, as I had supposed, has been given tending to show that fact, and given for that purpose. It is true the books say that no evidence of that character can be given by the prosecution unless some evidence has been given on the other side by the defense. In other words, there must be something to rebut or counteract. But I think the tendency of the evidence introduced by the defense was to show that her prospects had been injured, even taking the testimony of the defendant herself. That being the case, the testimony is admissible."

We are of opinion, however, that the mere fact that the evidence, as introduced upon the part of the prisoner, tended to show that her prospects had been injured by reason of her relations with the deceased, was not of itself enough to authorize the prosecution to begin a direct assault upon her character. No adjudicated case nor treatise upon the law brought to our attention maintains that it was, and such a doctrine would operate a grave innovation upon a recognized rule governing the introduction of evidence in criminal trials—an innovation, in our opinion, totally irreconcilable with the principle of law upon which the rule itself is founded, and which would, in practice, insensibly lead to its entire abrogation.

The authorities upon this point support the rule laid down by Mr. BURRILL in his work on Evidence (p. 533): "When the prisoner has once voluntarily offered his character as a

distinct subject of examination, and has actually put it in issue by adducing evidence in relation to it, the prosecution may then call witnesses to impeach his character, in order to rebut and counteract such evidence."

It is not sufficient, within this rule, that there be something in the facts or line of defense relied upon by the prisoner which might be made to appear in a less favorable aspect for her, by instituting an inquiry into her character and proving it to be other than of that ordinary degree of fairness which the law presumes it to be, for however peculiar the facts or circumstances may be in a given case, the rule is absolute upon the point that the character of the prisoner is not open to assault, as a distinctive feature of the case, until the prisoner shall have brought it forward and invited the attack of the prosecution, by arraying the evidence in its support. Until the prisoner thus initiates the inquiry, the prosecution are bound to assume it to be, as the law presumes it, ordinarily fair, and must establish her guilt, if at all, in the face of this presumption, and despite the benefit it affords her.

We are therefore of opinion that there was error in the ruling of the Court below in this respect.

The third and last point which we shall notice concerns the relative order in which the respective counsel—two upon either side of the case—were permitted to address the jury in summing up.

It appears by the record that on the fifteenth day of April the associate counsel of the District Attorney opened the argument and concluded on the same day. The Court then adjourned until the seventeenth of April, on which day Mr. Quint, one of the counsel for the defense, opened upon behalf of the prisoner, concluding on the twentieth of April, and that during his argument on the nineteenth he referred to the statute, and asserted that the defense had the right to finally close the argument. On the conclusion of Mr. Quint's

argument on the day following, this question arose for deter-
mination, when the Court ruled that though the prosecution
had opened, it was entitled, also, to make the closing argu-
ment.   The result was that the prosecution both opened and
closed the argument to the jury, the two counsel for the pris-
oner speaking in immediate succession.

Section three hundred and sixty-four of the Criminal Prac-
tice Act provides as follows: "Section 364.   If the indict-
ment be for an offense punishable with death, two counsel
on each side may argue the cause to the jury, in which case
they must do so alternately.   If it be for any other offense,
the Court may, in its discretion, restrict the argument to one
counsel on each side."

It is to be remarked that section three hundred and sixty-
four, as above recited, formed a part of the Act to regulate
proceedings in criminal cases, as enacted April 20th, 1850,
where it is to be found as section three hundred and ninety-
four (p. 303.)   In 1851 (pp. 251, 252) it was reënacted *in*
*totidem verbis* in the new statute of that year regulating pro-
ceedings in criminal cases, where it appears as section three
hundred and sixty-four, and it has ever since then remained
upon the statute book, without express alteration, amend-
ment, or repeal.

The distinctive features apparent in this section, consid-
ered by itself, are two:

First—That in capital cases the prisoner may insist upon
being heard through two counsel, and is not to be restricted
to one, as may be done in other cases.

Second—That in such cases the counsel addressing the
jury must do so alternately.

As originally enacted, in 1850, it was preceded by sections
three hundred and ninety-two and three hundred and ninety-
three of that Act, which provided, in substance that, *unless*
*the Court should otherwise direct*, the counsel for the people
*must* commence and *might* conclude the argument, but that

in every, case the counsel for the prisoner might, if he chose, insist upon making the closing argument. It will be seen, that under the Act of April, 1850, the order of the argument in a capital case, when two counsel on each side were to address the jury, was that the prisoner was entitled to the close absolutely, if insisted upon, and that in other respects the order of the argument was subject to the direction of the Court, except that the respective counsel must alternate in the argument.

The absolute right of the prisoner to conclude the argument being insisted upon under the Act of 1850, it would result that the prosecution must open; and the rule of alternation being then observed, the prisoner's counsel would necessarily make the closing argument. But if the counsel for the prisoner should not assert their right to make the closing argument, but, waiving that, should nevertheless insist upon the alternation of argument provided for by section three hundred and ninety-four of the Act of 1850, then the Court, under the authority conferred by section three hundred and ninety-three, might change the order of argument so that the defense would open, and the argument thence proceeding by alternation, the prosecution would necessarily make the closing argument.

In 1851 (pp. 251, 252,) the Act of 1850 was repealed, and a new statute enacted—in which statute sections three hundred and ninety-two, three hundred and ninety-three, and three hundred and ninety-four of the Act of 1850 were introduced as sections three hundred and sixty-two, three hundred and sixty-three, and three hundred and sixty-four, without any change of expression—and thus the statute remained until 1854. But in 1854 the right of the prisoner to conclude the argument, theretofore absolute in every criminal trial, was taken away by amendments then made

(p. 81) to sections three hundred and sixty-two and three hundred and sixty-three of the Act of 1851.

By these amendments (yet in force) it was provided, in substance, that the counsel for the people must open, and might conclude the argument, but that, by the permission of the Court, this order of argument might still be departed from. Section three hundred and sixty-four was, however, suffered to remain without express alteration or amendment. Of course, under the settled rule of statutory construction, that section of the statute is not to be considered as repealed by mere implication, either in whole or in part, except in so far as its provisions are found to be absolutely inconsistent with sections three hundred and sixty-two and three hundred and sixty-three, as amended in 1854. If, therefore, after giving full effect and scope to the amendment of 1854, section three hundred and sixty-four, as enacted in 1851, is still found to include any subject matter not at all embraced in the amendment of 1854, or if including the same subject matter as that embraced in that amendment, it still deals with that subject matter not inconsistently with the amendment itself, then so far forth the provisions of section three hundred and sixty-four of 1851 must continue to be observed in the conduct of that class of criminal cases to which it especially refers.

And after an attentive examination of the statute, and a consideration of the numerous amendments, which portions of it here have undergone, we are unable to discover any repugnance between section three hundred and sixty-four of 1851, upon the one hand, and sections three hundred and sixty-two and three hundred and sixty-three, as amended in 1854, upon the other. It is clear that the admitted right of a prisoner in capital cases to be heard at this day through two counsel, instead of being possibly restricted to one, as he may in cases of a lesser grade, exists solely by force of section three hundred and sixty-four of the Act of 1851,

and has not been impaired by the subsequent amendments to sections three hundred and sixty-two and three hundred and sixty-three of that Act passed in 1854. Those sections, referring, as they did, to the general subject of the argument of counsel in criminal trials of every grade, prescribed certain rules as to the right to open and close the argument; but those rules, when applied to the conduct of cases capital in degree, in which two counsel on each side were to address the jury, were qualified and restrained by the positive provisions of section three hundred and sixty-four, which provisions will be found to have always harmonized with sections three hundred and sixty-two and three hundred and sixty-three, notwithstanding the repeated amendments which these latter sections have from time to time undergone. It should be borne in mind that section three hundred and sixty-four (which, as we have seen, has been in force ever since April, 1850), never, by its terms, assumed to confer, or to take away either the right to open or the right to conclude the argument in any criminal case. That subject belonged elsewhere in the statute, and was provided for by the other sections referred to. The right to begin and the right to conclude were matters of distinct regulation by sections three hundred and sixty-two and three hundred and sixty-three of the Act of 1851. Section three hundred and sixty-four undertook to deal with an argument already began—it mattered not by which side—and declared that, by whomsoever begun, it should proceed by alternation between the counsel engaged. No matter how often by amendments to sections three hundred and sixty-two and three hundred and sixty-three of the statute the right to close might be shifted from one side to the other, the rule of alternation in the argument, under section three hundred and sixty-four, would still remain undisturbed. The general result, under the rule of alternation, would naturally be that the one side would open and the other would close the

argument to the jury, and that neither side would have the right to both the opening and the close of the argument. Had the amendments to sections three hundred and sixty-two and three hundred and sixty-three, as adopted in 1854, provided in terms that the prosecution should, at all events, both open and close the argument, it might then have been claimed that the principle of alternation, before then provided for by section three hundred and sixty-four, had been swept away by necessary implication, since, upon the supposition that each of the counsel should address the jury but once, such alternation would have become incompatible with the absolute right so conferred upon the prosecution to both open and close the argument. But these amendments of sections three hundred and sixty-two and three hundred and sixty-three do not so provide. The language of section three hundred and sixty-two is that "the counsel for the people must open and may conclude the argument," followed immediately by section three hundred and sixty-three, providing that the Court may, in the exercise of its discretion, change the order of argument named in section three hundred and sixty-two. The result is, that so long as the rule of alternation in the argument of a capital case remains upon the statute book, in the absence of an order of the Court on the subject, the prosecution must open and the counsel for the prisoner conclude the argument to the jury. And in view of this rule it devolves upon the Court, in its discretion, under section three hundred and sixty-three, to direct in such a case by whom the argument is to be opened, and thus it will occur that the opening argument must fall to one, and the closing argument to the other side, which result, we think, was intended by the statute, when, in 1854, it took from the prisoner the exclusive right to close in all cases, which he had theretofore possessed.

The Court having given no direction upon the subject at the trial, and the counsel for the prosecution having opened

the argument to the jury, we think that the right to the close fell to the counsel for the prisoner, and there was error in refusing to him the exercise of that right.

Judgment reversed and cause remanded for a new trial.

Crockett, J., concurring:

The defense relied upon in this cause is, that at the moment when the fatal shot was fired the accused was laboring under a temporary insanity, proceeding from certain physical causes, aggravated by the extraordinary mental excitement occasioned by the circumstances which immediately preceded the killing. The proof of the defendant's bad reputation for chastity was offered and submitted solely on the ground that it tended to rebut the inference that the alleged mental excitement of the defendant was occasioned by a sense of shame and mortification which she experienced on account of the damage which she supposed her reputation had suffered by reason of her connection with Crittenden. The proof was, therefore, admitted for the purpose of throwing some light on the question of her mental condition at the moment when the deed was committed. If the defendant had offered any proof whatever that, previous to her relation with Crittenden, her reputation for chastity was good, and that the damage to that reputation which ensued from her connection with Crittenden so preyed upon her mind, in her then state of physical debility, as to result in a state of temporary insanity, it would have been clearly competent for the prosecution to rebut this presumption by proof that she had no reputation to lose, and consequently that she could not have experienced any great mental excitement occasioned by the loss of a reputation which she did not possess. But the defendant offered no proof whatever as to her previous reputation; and even in her own account of the transaction, and of the state of her mind at the time, did not attribute

her alleged temporary insanity to any mental excitement resulting from a supposed loss of her reputation. On the contrary, she attributes it partly to her physical condition and partly to the excitement produced by a fear that she was about to lose or was in danger of losing the affections of Mr. Crittenden, to which, it appears, she claimed to have a better right than his lawful wife. In the absence of all proof on her part tending to show that her alleged mental aberration was in any degree produced by a sense of shame or mortification occasioned by any damage to her good name, it was not competent for the prosecution to prove that her reputation for chastity was bad. She had offered no proof tending to show that it was good, and she did not pretend, in her version of the transaction, that her alleged insanity resulted in any degree from the loss of a previously good reputation.

I am, therefore, of opinion that the proof offered by the prosecution on this point was improperly admitted, inasmuch as it did not tend to rebut any proof offered by the defense, nor to elucidate the causes to which she attributes her alleged insanity. I have deemed it proper to add my views on this branch of the case to those of Mr. Justice WALLACE, not because I dissent from any proposition stated by him, but for the reason that it has been insisted with much earnestness by the counsel for the prosecution that the proof of reputation in this case does not fall within the general rule which allows the reputation of the accused to be assailed only in rebuttal of proof of a good reputation offered by the defendant.

I concur in the judgment and with Mr. Justice WALLACE on the other questions discussed in his opinion.