[No. S004565, Crim. No. 23286. Aug. 29, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM GEORGE BONIN, Defendant and Appellant.

660

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Monica Knox, Chief Assistant State Public Defender, and Adrian K. Panton, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jay M. Bloom, John W. Carney and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This is an automatic appeal from a judgment of death (Pen. Code, § 1239, subd. (b)) imposed under the 1978 death penalty law (*id.,* § 190.1 et seq.).

After a jury trial defendant was convicted of the first degree murder (Pen. Code, § 187) and robbery (*id.,* § 211) of Dennis Frank Fox, Glenn Barker, Russell Rugh, and Lawrence Sharp. As to each murder count, he was found to have been convicted in the same proceeding of more than one offense of murder within the meaning of the multiple-murder special circumstance of Penal Code section 190.2, subdivision (a)(3). For each of the four murders he received the penalty of death.

As we shall explain, we conclude that the judgment must be affirmed.

## I. THE FACTS

As a result of his activities in Southern California in the years 1979 and 1980, defendant—who was then in his early 30's—was dubbed the "Freeway Killer" and his murders the "freeway killings." Before he was tried in this Orange County proceeding, he was tried by a jury in Los Angeles County action No. A360975. There he was convicted of the first degree murder and robbery of Marcus Grabs, Donald Hyden, David Murillo, Charles Miranda, James Macabe, Ronald Gatlin, Harry Todd Turner, Steven Wood, Darin Lee Kendrick, and Steven Wells; as to each murder count, special circumstance allegations of multiple murder and felony murder-robbery (Pen. Code, § 190.2, subd. (a)(17)(i)) were found true; and for each murder he received the penalty of death.

The tale that is told by the evidence introduced at the guilt phase of the lengthy trial of this action is as follows.

On December 2, 1979, the nude body of 17-year-old Dennis Frank Fox was found on the side of the Ortega Highway in Casper's Regional Park in Orange County; no clothing or other identifying evidence was discovered at the scene. Fox had been killed by ligature strangulation about November 30. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on the ankles and wrists as well as an approximately one-half inch ligature mark on the neck, revealed indications of sexual activity before death, and bore triskelion-shaped fibers in the pubic area.

On March 22, 1980, the nude body of 15-year-old Russell Rugh was found off the Ortega Highway in the San Juan Campgrounds in Orange

County; no clothing or other identifying evidence was discovered at the scene. Rugh had been killed by ligature strangulation on March 21 or 22. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on the ankles and wrists as well as an approximately one-half inch ligature mark on the neck, revealed indications of sexual activity before death, and bore triskelion-shaped fibers in the pubic area.

On the same day and in the same place that Rugh's body was discovered, the nude body of 14-year-old Glenn Barker was found; no clothing or other identifying evidence was discovered at the scene. Like Rugh, Barker had been killed by ligature strangulation on March 21 or 22. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on the ankles and wrists as well as an approximately one-half inch ligature mark on the neck, revealed indications of sexual activity before death, and bore triskelion-shaped fibers in the pubic area.

On May 18, 1980, the nude body of 17-year-old Lawrence Sharp was found at a gasoline station on the corner of Westminster Boulevard and Bolsa Chica in Westminster in Orange County; no clothing or other identifying evidence was discovered at the scene. Sharp had been killed by ligature strangulation on May 17 or 18. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on the ankles and wrists, as well as an approximately one-half inch ligature mark on the neck, revealed indications of sexual activity before death, and bore triskelion-shaped fibers in the head hair.

In order to establish that it was defendant who had perpetrated the killings, the prosecution presented expert testimony that the triskelion-shaped fibers discovered on the body of each of the victims were consistent with carpeting in a van owned by defendant, and that the van was stained in several places with human blood.

To establish identity, the prosecution also introduced "other crimes" evidence relating to the killing of Charles Miranda and Steven Wells.[1]

On February 3, 1980, the nude body of 15-year-old Charles Miranda was found in an alley in downtown Los Angeles; no clothing or other identifying evidence was discovered at the scene. Miranda had been killed by ligature strangulation in the late night of February 2 or in the early morning of February 3. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on the ankles and wrists as well as on the neck,

---

[1] The prosecution had moved to introduce "other crimes" evidence relating to James Macabe and Darin Lee Kendrick as well as Miranda and Wells. The court granted the motion as to the latter two victims but denied it as to the former.

revealed indications of sexual activity before death, and bore the same kind of triskelion-shaped fiber in the pubic area that the bodies of Fox, Rugh, Barker, and Sharp bore.

Gregory Miley, a sexual partner of defendant and about 19 years old at the time relevant here, testified that it was defendant who was responsible for the death of Miranda. Specifically, he said that he was with defendant as defendant was driving his van on the night of February 2, 1980; defendant picked up Miranda in Hollywood and consensually sodomized him in the back of the van; he then tied him up; afterwards, he said to Miley, "Kid's going to die. Kid's going to—this kid's going to die," Miley responded, "Why don't you just let the kid go?," and defendant replied, "No, because he'll know us and he'll know the van"; defendant then proceeded to strangle Miranda with Miley's help, dumped his body in an alley in downtown Los Angeles, and disposed of his clothing and other property in various locations.

On June 3, 1980, the nude body of 18-year-old Steven Wells was found behind a gasoline station in Huntington Beach; no clothing or other identifying evidence was discovered at the scene. Wells had been killed by ligature strangulation on June 2. The body showed signs of beating about the face and elsewhere, exhibited ligature marks on the ankles and wrists as well as on the neck, revealed indications of sexual activity before death, and bore the same kind of triskelion-shaped fiber that the bodies of Fox, Rugh, Barker, Sharp, and Miranda bore.

James Munro, a sexual partner of defendant and about 19 years old at the time relevant here, testified that it was defendant who was responsible for the death of Wells. Specifically, he said that he was with defendant as defendant was driving his van on June 2, 1980; defendant picked up Wells as he was hitchhiking and participated in mutual consensual oral copulation with him in the back of the van; the trio eventually arrived at defendant's home in Downey; there, defendant and Wells continued their sexual activity; soon defendant persuaded Wells to allow himself to be tied up; defendant took money and items of identification from Wells's wallet; he then proceeded with Munro's help to strangle Wells and to dump his body behind a gasoline station in Huntington Beach; defendant told Munro that he was the "Freeway Killer," and that Miley was involved with him in the killings.

To establish identity, the prosecution also introduced evidence of extrajudicial admissions by defendant linking him to the charged crimes. Among other witnesses it called one David Lopez, a reporter for Los Angeles television station KNXT. Lopez testified that defendant had admitted that

it was he who killed Fox, Rugh, Barker, and Sharp, and also Miranda and Wells. Other witnesses gave testimony to the effect that defendant had said he would not leave witnesses to his criminal activity alive.

Through the examination of its own witnesses and the cross-examination of the prosecution's, the defense attempted to show that the evidence could not support a determination beyond a reasonable doubt that it was defendant who killed Fox, Rugh, Barker, and Sharp or even Miranda and Wells. Specifically, in its case-in-chief it attacked Munro's credibility and tried to undermine the persuasiveness of the prosecution's expert testimony concerning the triskelion-shaped fibers found on the victims' bodies.

At the penalty phase the prosecution presented evidence in aggravation. Some of that evidence related to prior adjudicated felonies and told the following tale. Defendant committed sexual attacks in late 1968 and early 1969 against 12-year-old Lawrence B., 14-year-old William J., 17-year-old John T., and 18-year-old Jesus M. As a result of his activities, in the spring of 1969 he was convicted of molesting and forcibly orally copulating Lawrence B., kidnapping and sodomizing William J., sodomizing John T., and forcibly orally copulating Jesus M., and was committed to Atascadero State Hospital as a mentally disordered sex offender amenable to treatment. In 1971 he was returned to court, declared unamenable to treatment, and committed to prison. Subsequent to his release, defendant committed a sexual attack on 14-year-old David M. in September 1975. Later that year he was convicted of forcibly orally copulating the boy and was sentenced to prison.

The prosecution also introduced evidence relating to the Los Angeles killings. Specifically, it attempted to prove that in Southern California between August 1979 and June 1980 defendant sexually attacked and killed Marcus Grabs, Donald Hyden, David Murillo, Charles Miranda, James Macabe, Ronald Gatlin, Harry Todd Turner, Steven Wood, Darin Lee Kendrick, and Steven Wells, all of whom were children or youths. It also attempted to show that Kendrick was killed in the performance of a ritual of the black art.

In mitigation the defense presented evidence that told the following tale. Although his father caused the family serious problems as a result of drinking and gambling, defendant was a good and helpful child. At a young age he was sodomized by older men. He joined the armed forces and served in Vietnam. There he earned a medal for gallantry for saving a soldier at the risk of his own life. There also he began to engage in violent nonconsensual homosexual activity. He returned from Vietnam a changed man. His downward course into sexual criminality continued, culminating in murder.

Apart from his difficulties with regard to sex, however, he was a good and helpful man.

## II. GUILT ISSUES

Defendant makes three claims bearing on the issue of guilt. As we shall explain, none establishes reversible error.

### A. *Denial of Motion for Change of Venue*

■ Defendant contends that the court erred when it denied a motion he made seeking a change of venue because of pretrial publicity.

Penal Code section 1033 (hereinafter section 1033) provides in relevant part as follows. "In a criminal action pending in the superior court, the court shall order a change of venue: [¶] (a) On motion of the defendant, to another county when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." The provision is in essence a codification of the "standard of reasonableness" that we laid down in *Maine* v. *Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], to guide trial courts in ruling on motions for change of venue and appellate courts in reviewing such rulings. (*Id.* at p. 383.) The *Maine* standard, in turn, is ultimately an implementation of Sixth and Fourteenth Amendment safeguards relating to the right of a criminal defendant to receive a fair trial before an impartial trier of fact. (See *id.* at pp. 381-384.)

Under section 1033 a criminal defendant may make a motion for change of venue based on pretrial publicity and its effect on the community from which the jurors for his trial are drawn. (E.g., *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1130 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn.).)

■ In passing on such a motion, the trial court looks to the following factors, among others: the nature and gravity of the offense, the size of the community, the status of the defendant, the popularity and prominence of the victim, and of course the nature and extent of the publicity. (See, e.g., *People* v. *Anderson, supra,* 43 Cal.3d at p. 1130 [stating the factors as guides for an appellate court's review of a change-of-venue ruling]; *People* v. *Harris, supra,* 28 Cal.3d at p. 948 [same].)

■ The ultimate question that the trial court must resolve, however, is whether on the peculiar facts of the individual case (see *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 388) there is a reasonable likelihood that the jurors who will be, or have been, chosen for the defendant's trial have

formed such fixed opinions as a result of pretrial publicity that they cannot make the determinations required of them with impartiality. (Cf. *Patton* v. *Yount* (1984) 467 U.S. 1025, 1035 [81 L.Ed.2d 847, 856, 104 S.Ct. 2885] [holding that for the resolution of a claim that pretrial publicity so infected a criminal trial as to deny the defendant his Sixth Amendment right to an impartial jury, "The relevant question is . . . whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant"].)

The phrase "reasonable likelihood," we have explained, means something less than "more probable than not." (E.g., *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 578 [174 Cal.Rptr. 701, 629 P.2d 502].) But in view of the plain meaning of its words it must also mean something more than merely "possible."

Finally, as the moving party the criminal defendant seeking change of venue bears the burden of proof. (See *People* v. *Boyce* (1982) 128 Cal.App.3d 850, 856-859 [180 Cal.Rptr. 573]; *People* v. *Whalen* (1973) 33 Cal.App.3d 710, 716 [109 Cal.Rptr. 282].)

The facts relevant to defendant's claim are as follows. In June 1980 defendant was arrested in connection with the "freeway killings." He was subsequently charged in Los Angeles County and Orange County. In October 1981 trial in the Los Angeles action commenced with jury selection. In the course of trial, evidence of the four Orange County murders was introduced to establish identity. In January 1982 the jury found defendant guilty of 10 counts of robbery and 10 counts of first degree murder with special circumstances as to each count, and fixed the punishment for each murder at death. In March 1982 the court entered judgment in accordance with the jury's verdicts. The news coverage relating to defendant and to the "Freeway Killer" and the "freeway killings" was extensive.

In July 1982, prior to commencement of trial in this action, defendant moved for change of venue because of pretrial publicity. After a lengthy hearing, the court denied the motion in November of the same year. Its reasoning was as follows.

"Bearing in mind the criteria which the court must take into consideration in evaluating the pending motion, the court has made the following determinations.

"First of all, with reference to the nature and gravity of the offense, certainly the court can think of no offense or offenses which would be more

grave than those which are pending in this particular case. [¶] There are pending the four murder charges.

"Secondly, with reference to the size of the community, the evidence is clear that we have a community that is approximately two million people—consists of approximately two million people. [¶] Additionally, the voter registration is in excess of one million. [¶] The court . . . also notes that the panels now drawn also consist of both people who have registered to vote, and, in addition thereto, we also draw from people who have obtained driver's licenses that may not be registered. [¶] Consequently, it is the court's determination from those facts that the pool which would be available is in excess of the number of people who are registered to vote.

"The next criteria is the status of the defendant in the community or of the victims in the community. Certainly there is nothing in the record that would indicate that either of the individuals have any particular status except when we are dealing with numerous victims, then we do have a situation where, within isolated groups within particular communities which comprise the county as a whole, then a certain status does arise.

"And then the last is the nature and extent of the coverage. Obviously this is a case that has commanded a great deal of media coverage both by radio—pardon me, both television and newspaper, and in addition thereto, some radio coverage. [¶] The determination that the court has to make just what effect has this coverage had on the minds of the community which would lead the court to believe that the defendant could not—there is a reasonable likelihood that the defendant would not obtain a fair trial within this county.

"Where the court has some difficulty, and I might state for the record a reason that I have this question, I have sat on cases which in my mind have commanded a great deal of publicity when I've thought there's absolutely no way that we can get anyone who has not heard of this case, and whether they've even formed an opinion, but they've never heard of the case.

". . . . . . . . . . . . . . . . .

"In this case, I don't have anything, be it a poll taken informally by somebody at a shopping center, I don't have a poll that was taken in what might be called a formal way of someone, what percentage of the people have heard of the case, formed any opinions with reference to the case.

"I don't have any evidence as to who watched what on television, what channels they watched, if in fact they do watch, what newspapers they take,

if in fact they take any newspapers, and what effect, if in fact they do take newspapers, anything that they might have read has had upon them.

"Additionally, it appears to the court that we're not talking, and one of the manners in which the court can perhaps dilute adverse publicity, if it determines that some exists, is for continuances so that the coverage has been diluted to the extent that perhaps it would not reflect adversely upon the defendant's right for a fair trial.

"In this case, the court does note that there has been a minimum amount of publicity regarding this case, at least since the imposition of the sentence in Los Angeles County.

"The court, in taking the totality of the evidence that has been presented, makes a determination at this time that there has been an inadequate showing that the defendant is likely not to receive a fair trial in Orange County.

"I think based upon the size of the community, that there is undoubtedly a large group of individuals who either have not heard about the case or if they have heard of it, heard so little that in no way is the defendant not going to be able to get a fair trial in Orange County.

". . . . . . . . . . . . . . . . . . . ."

"The motion for change of venue is denied." (Some paragraphing not original.)

In March 1983 trial commenced with jury selection. A total of 204 prospective jurors were subjected to voir dire. Of this number, 174 had been exposed in some degree to pretrial publicity either directly or indirectly, including 60 who had been exposed to news coverage relating to the Los Angeles action; of the 204 prospective jurors, 39 were excused because of bias. In the course of the selection process, but before he had exhausted the 26 challenges allotted to the defense, defendant moved for 8 to 10 additional peremptory challenges. The court denied the motion without prejudice to renewal later in the process. Subsequently, defendant exhausted his peremptory challenges but did not renew his motion. Twelve jurors and four alternates were eventually selected. Ten of the jurors and all the alternates had been exposed to pretrial publicity, including three jurors and one alternate who had come upon news coverage relating to the Los Angeles action. Most of these persons, however, had been exposed to such publicity indirectly and to a minimal degree.

In June 1983, after selection of the jury was completed, defendant renewed his motion for change of venue in light of the record of voir dire. He

argued, in substance, that practically all the jurors and alternates had been exposed to pretrial publicity and that their memories would be refreshed by the evidence introduced at trial. The court denied the motion. Its reasoning was as follows.

"The court has examined the transcripts relating to the various prospective jurors. The court has reached the determination that there does not exist a reasonable likelihood that in the absence of a change of venue the defendant would not obtain a fair trial in this particular county.

"I think based on the court's interpretation of the answers given by the prospective jurors and those who ultimately were seated as jurors in this particular case, it is the court's opinion that the defendant will, in fact, receive a fair trial as it relates to the pending charges against him.

"The matter can be subject to much speculation as to what people potentially can do based upon having memories refreshed. The whole question is that there is no evidence that any of them have memories that would, in fact, be refreshed; any memories of the incidents that would in fact be refreshed based upon the information that they provided to the court and to counsel in the examination.

"In totality, the court has exercised its discretion in various—as it relates to various prospective jurors. The court has excused certain ones because of the evaluations made by the court based upon the demeanor, the method of answering questions and the answers given to the various questions propounded to the prospective jurors.

"Those that the court did not excuse for cause, the court in its view did so justifiably.

"In the court's ultimate decision, there is no reason to grant a change of venue. The motion is denied."

Defendant now claims that the court erred by denying his motion for change of venue. ■ In considering his point, we review the trial court's resolution of factual questions under the deferential substantial-evidence standard. (*People* v. *Louis* (1986) 42 Cal.3d 969, 985 [232 Cal.Rptr. 110, 728 P.2d 180].) We review its resolution of legal questions under the nondeferential de novo standard. (*Ibid.*) And we generally review its resolution of mixed questions of law and fact—i.e., its application of law to fact—under the de novo standard as well. (*Id.* at pp. 985-987.) The ultimate question of the reasonable likelihood of a fair and impartial trial is plainly such a mixed question. (Cf. *id.* at p. 988 [concluding that the issue of whether the prose-

cution has exercised due diligence in procuring a witness's attendance is a mixed question of law and fact].)

 We believe that the trial court did not err when it denied the original motion. Specifically, the court's essentially factual determination that the crimes charged were grave; that the size of the community was very large; that defendant had no particular status in the county; that the victims were similarly without status in the community as a whole; and that pretrial publicity, though extensive in the period preceding imposition of sentence in the Los Angeles action in March 1982, had been minimal in the time that followed—each of these findings is clearly supported by substantial evidence.

Further, the court's determination of the ultimate mixed law-fact question of the reasonable likelihood of an unfair trial was proper: on independent review, we believe that defendant failed to carry his burden.

To begin with, the factors relating to the size of the community, the status of the defendant, and the popularity and prominence of the victims weigh in favor of the likelihood of a fair trial.

It is true that the factors relating to the nature and gravity of the offense and the nature and extent of pretrial publicity go in the other direction. Among other things, the record reveals the following. As noted above, news coverage concerning defendant was extensive. There were reports that defendant had a hand in the "freeway killings" and was in fact the "Freeway Killer"; he had a history of mental illness and of prior convictions for sexual offenses against young men and boys; he was involved in homosexuality, torture, and "black magic"; he had been linked to the killing of as many as 44 young men and boys; he was implicated in certain murders by alleged accomplices; and he had himself admitted to 21 killings. It was also reported that a dispute had arisen between prosecutors in Los Angeles and Orange Counties as to who would try defendant first. Further, there were reports concerning the Los Angeles action. Among other things, these stories recounted the evidence introduced at trial—including the four Orange County murders—and stated that defendant was convicted of ten murders and sentenced to death.

We believe, however, that the weight of the factors relating to the nature and extent of the pretrial publicity must be reduced to less than that of the other countervailing factors. The potentially prejudicial effect of the news coverage here must be presumed to have diminished. As the trial court observed, the coverage had been minimal since imposition of sentence in the Los Angeles action. "That time soothes and erases is a perfectly natural

phenomenon, familiar to all." (*Patton* v. *Yount, supra,* 467 U.S. at p. 1034 [81 L.Ed.2d at p. 856].)

In conclusion, we are of the opinion that defendant failed to carry his burden of proving that there was a reasonable likelihood that jurors drawn from Orange County would have formed such fixed opinions as a result of pretrial publicity that they could not make the determinations required of them with impartiality. Defendant, we concede, may have shown the *possibility* of an unfair trial in Orange County. But such a showing, as we have explained, is insufficient. Hence, the court did not err by denying the original change-of-venue motion.

■ We also believe that the trial court did not err when it denied the motion for change of venue as renewed on completion of jury selection: on independent review and after consideration of the record of voir dire, we are of the opinion that defendant failed to carry his burden. The record, to be sure, reveals that 10 of the 12 jurors and 3 of the 4 alternates had in fact been exposed to news coverage relating to defendant—although most of them indirectly and to a minimal degree. But it simply does not support the conclusion that there was a reasonable likelihood that any of those 16 persons had formed such a fixed opinion as a result of pretrial publicity that he could not make the determinations required of him with impartiality.

Against our conclusion, defendant argues in effect as follows. The pretrial publicity in this case, he begins, carried a great potential for prejudice: this proposition, he asserts, is established by the number and enormity of the crimes involved and the extensiveness of the coverage, and is confirmed by the fact that 39 of the 204 prospective jurors subjected to voir dire were excused because of bias. This great potential for prejudice, he goes on, cannot be deemed to have diminished substantially between March 1982, when sentence was imposed in the Los Angeles action and coverage became minimal, and March 1983, when jury selection in this proceeding began: a year is simply too brief a period of time. In view of this great and undiminished potential for prejudice, he concludes, we must presume that, at least when they had their memories refreshed by the evidence introduced at trial, the jurors and alternates might not have been able or willing to be fair and impartial.

Defendant's argument is to no avail. To begin with, it appears to be essentially empty of persuasive force, supported as it is more by conjecture than by evidence. In any event, it seems to establish at the very most the mere *possibility* of an unfair trial. But such a showing, as we have explained, is insufficient.

Defendant may also be understood to argue that the fact that he exhausted his 26 peremptory challenges supports his claim that there was a reasonable likelihood of an unfair trial before partial jurors. Such an argument, however, would be unpersuasive. On this record the exhaustion of peremptory challenges establishes only defendant's dissatisfaction with 26 prospective jurors and not the reasonable likelihood of bias on the part of any of the jurors or alternates actually selected.

In conclusion, we are of the opinion that defendant failed to carry his burden of proving that there was a reasonable likelihood that the jurors and alternates actually selected for his trial had formed, or would at trial form, such fixed opinions as a result of pretrial publicity that they could not make the determinations required of them with impartiality. Hence, the court did not err by denying the renewed change-of-venue motion.

## B. *Denial of Motion for Additional Peremptory Challenges*

■ Defendant contends that the court erred by denying his motion for additional peremptory challenges. Specifically, he argues that in view of the pretrial publicity in this case and its potentially prejudicial effect the federal and state constitutional guaranties of a fair trial before an impartial jury required the court to grant his motion. We do not agree.

We believe that the court's ruling was justified on procedural grounds. As noted above (see pt. II.A, *ante*), defendant made his motion for additional peremptory challenges before he had exhausted the 26 peremptory challenges allotted to the defense. The court denied the motion without prejudice to renewal later in the process of jury selection. Defendant, however, never renewed the motion. On these facts, we conclude, defendant's motion was premature and properly denied as such.

We also believe that the court's ruling was sound on the merits. We are of the opinion that to establish the constitutional entitlement to additional peremptory challenges argued for here, a criminal defendant must show at the very least that in the absence of such additional challenges he is reasonably likely to receive an unfair trial before a partial jury. (Cf. *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 363 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507] ["where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, [to protect the criminal defendant's due process rights] the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity"].) But as we concluded above (see pt. II.A, *ante*), defendant has failed to make such a showing. Accordingly, we hold the court's denial of his request was proper.

## C. *Prosecutorial Misconduct*

■ Defendant contends that the prosecutor engaged in misconduct by eliciting from television reporter David Lopez testimony to the effect that defendant had admitted to 14 killings in addition to the murders of Fox, Barker, Rugh, and Sharp—for which he was on trial—and the murders of Miranda and Wells—which were introduced to establish identity. The facts relevant to this claim must be presented at length.

As noted above (see fn. 1, *ante*), the court had previously ruled admissible only that "other crimes" evidence which related to the killing of Miranda and Wells. After Lopez took the witness stand but before his examination commenced, a colloquy ensued among the court and counsel at the bench out of the hearing of the jury. In relevant part the discussion was as follows.

"[DEFENSE COUNSEL TRACY] STEWART: When Bryan [Brown, the prosecutor,] and I discussed this morning before lunch that Lopez might be called this afternoon and I told Bryan I would prefer that [Defense Counsel William Charvet] do the cross-examination of Lopez because I didn't have any transcript and Bryan was nice enough to photocopy some transcripts for me. [¶] But in looking at those briefly, I'm concerned that a number of things may come up that would be very prejudicial. [¶] He testified in the L.A. trial of all of the—I think 23—23 murders. [¶] I don't know to what extent he's been cautioned not to mention the others.

"THE COURT: Let me indicate this. I don't know where we are going for sure. Before we get into other things, because once again I don't know where we are going, be sure to let me have a chance to find out what it is. In other words, if you want to do it now or what—

"MR. BROWN: Would you like an offer at this time?

"THE COURT: Sure.

"MR. BROWN: Can I get my notes?

"THE COURT: Sure.

". . . . . . . . . . . . . . . . . .

"MR. BROWN: Mr. Lopez is a reporter for KNXT Channel Two News. He will testify that he has had a number of different conversations with Mr. Bonin starting in December of 1980 and proceeding through April 1981; that Mr. Bonin has described approximately 21 different killings to Mr.

Lopez. [¶] I don't know if the court wants me to make an offer of proof of what I intend to elicit at this time.

"THE COURT: Well, what I'm interested in, based upon what Tracy said, obviously if Bonin admitted the four that we are concerned with down here and the two that were admitted as similar acts, I don't have any great problem with those. [¶] *Now, if we're getting into 17 other murders, then I want to know why.*

"MR. BROWN: *Okay, I don't intend to elicit any conversations between Bonin and Lopez with respect to murders other than Fox, Rugh, Barker, Sharp, Wells and Miranda.* [¶] Mr. Bonin has told Mr. Lopez about other murders, but I do not intend to do that at this time.

"THE COURT: Okay.

"MR. BROWN: I was going to save those in the event that we do reach a penalty phase.

"THE COURT: All right.

"MS. STEWART: The only problem I have is as far as I know, Lopez has never testified that Bonin mentioned names specifically; at least, it doesn't appear in Lopez' testimony.

"MR. BROWN: He has. Bonin mentioned Rugh and Barker's name and the—there is an issue here that Tracy's talking about. This is the issue: [¶] With respect to Fox, Bonin never mentioned Fox' name. But in that respect—I don't mind if you read my notes; that's okay. That's all right. [¶] With respect to Fox, Lopez said—or excuse me. There were 21—there was a list of 21 homicide victims that was generally recognized and that Mr. Lopez and Mr. Bonin had talked about and agreed on. [¶] Fox' name was on that list at the time Mr. Lopez talked to Bonin. The defendant said that he killed everyone on the list except one. The one he did not kill was a fellow named Lundgren, L-U-N-D-G-R-E-N. And Lundgren was a kid that was killed in Los Angeles and has his penis severed, and Bonin indicated to Mr. Lopez that Bonin does not cut dicks off little kids, are the words he used. [¶] So Bonin admitted to Lopez that he killed everyone on the list of 21 except Lundgren. [¶] Fox is on the list. Okay? [¶] Bonin also said that he dumped two kids, Rugh and Barker, not far from where he dumped another body off, which would be Fox, in that Fox is just several miles down the Ortega towards the I-5 freeway. [¶] And that's the only—Fox is the only person that the defendant was talking about when he was talking about the

other body dumped. [¶] Now, with respect to Rugh and Barker, Bonin gives Lopez their names. Rugh and Barker's names.

"THE COURT: Well, I might indicate, I'm not sure that I need to go into a whole lot more. *I was concerned into the breadth of what you were going to go into; in other words, whether you're going to talk to him about 21 murders.* [¶] *And as I understand, all that you're doing right now is you're going to talk to him about the four with which he's charged here in the manner that you've described.* [¶] *And in some way they have to be tied into it. I mean, either directly by name or some other circumstantial deal.* [¶] *And the other two, Miranda and Wells, and so I don't have any particular problem with it.*

"MR. BROWN: Okay.

"THE COURT: So, you know, it appears to me to be—

"MR. BROWN: That's fair.

"THE COURT: Okay.

"MS. STEWART: Are you offering this as an admission?

"MR. BROWN: Yes.

"THE COURT: Well, it's an admission and/or confession.

"MR. BROWN: Right, it's really a confession." (Italics added.)

Thereupon the prosecutor began to question Lopez. He elicited testimony that defendant admitted to the killing of Barker and Rugh. He then turned to the killing of Fox.

"Q Now, with respect to Frank Fox, did you have a conversation with Mr. Bonin concerning Frank Fox?

"A Never by name.

"Q Okay. Mr. Bonin at no time mentioned Frank Fox' name?

"A Never.

"Q Did Mr. Bonin talk to you about a—an individual that he had killed and dumped near the Ortega Highway?

"A He said it—

"Ms. STEWART: Objection, relevance.

"THE COURT: Overruled.

"THE WITNESS: He said it in this manner: 'I dumped Rugh and Barker not far from where I dumped the other kid.' And I never pursued who the other kid was.

"Ms. STEWART: Objection. Nonresponsive.

"THE COURT: What was the last, Miss Stewart?

"Ms. STEWART: As to his answer, he's nonresponsive. Motion to strike everything after the response, which was yes or no.

"THE COURT: Overruled. Motion to strike denied.

"Q BY MR. BROWN: Had Mr. Bonin—or did Mr. Bonin at any time indicate to you that he had, though, killed Frank Fox without using Mr. Fox' name?

"A Well, again, the way he said it is that he dumped the bodies of Rugh and Barker—

"Ms. STEWART: Objection.

"THE WITNESS: —not far from where he dumped the other kid.

"MR. BROWN: There's an objection pending.

"THE COURT: What was the objection?

"Ms. STEWART: The answer was nonresponsive to the question. It called for a yes or no answer. I would request that the court—

"THE COURT: No, I think the answer was responsive. The question was objectionable as calling for a conclusion. [¶] Proceed.

"Q BY MR. BROWN: Did you talk to Mr. Bonin about a list of homicide victims, murder victims, that included the name of Frank Fox?

"A Yes.

"Q What was that particular conversation?

"Ms. STEWART: Objection. Lack of foundation of the list itself. The question is not relevant.

"THE COURT: Lack of foundation and what's the latter part?

"Ms. STEWART: Relevance.

"THE COURT: Overruled.

"THE WITNESS: In answering that question, I'm going to have to refer to some names that deal with the Los Angeles case. Do you want me to answer that question?

"MR. BROWN: No.

"THE COURT: Just listen very carefully to the questions and just answer the questions if you will.

"Q BY MR. BROWN: It's not comfortable being up on the witness stand, is it?

"A Well, it's—

"Q Because you—

"A I would much rather be doing a story that I'm supposed to be doing today, to be quite honest with you.

"Q We all understand that.

(Laughter.)

"Let me ask you this: did you talk to Mr. Bonin about a list of homicide victims that included the name of Frank Fox?

"A That's correct, yes, I did.

"Q How many victims were on that list?

"Ms. STEWART: Objection. Relevance. And also on the court's prior ruling.

"THE COURT: Overruled. He may answer that.

"THE WITNESS: There were 21 names on that list.

"Q BY MR. BROWN: And was Mr. Fox' name included on that list?

"A Yes.

"Q Was this list at some time published?

"A Yes.

"Q And was it published in a number of different media?

"A Yes.

"Q Newspapers and television?

"A Yes.

"Q And specifically was it published in the Orange County *Register*?

"A Yes.

"Q At the time it was published at least in the *Register*, were there photographs of these 21 individuals published with the list?

"A I think there were actually 20 photographs—

"MS. STEWART: Objection.

"THE WITNESS: With one John Doe. But to answer the question—

"THE COURT: Just a minute, Mr. Lopez.

"MS. STEWART: Objection on the grounds of relevancy as to the photographs. And it's hearsay.

"THE COURT: Overruled.

"Q BY MR. BROWN: Now, was Frank Fox' photograph also included—

"A Yes, it was.

"Q —in the photographs with the list?

"A Yes, it was.

"Q Did Mr. Bonin indicate to you whether or not he had murdered the people that were on that list?

"Ms. Stewart: Objection. The question is ambiguous, and it's not relevant.

"The Court: Overruled.

"The Witness: I asked him that point blank. And his answer was, through a quote, 'I killed all but one. I didn't kill Lundgren because I don't cut the dicks off little kids.'

"Ms. Stewart: Can we approach the bench, Your Honor?

"The Court: Yes."

Thereupon Defense Counsel Stewart moved for a mistrial. The court denied the motion. Counsel then moved to strike the testimony under challenge. The court denied that motion as well. The relevant colloquy was as follows.

"Ms. Stewart: Why did you have to do that?

"Mr. Brown: I didn't do anything. What did I do?

"Ms. Stewart: There are 21 names on the list. You just asked him if he killed them, and he said: Yes, all of them but Lundgren.

"Mr. Brown: So? That's—that's Fox. That's what we were talking about up here.

"The Court: How else was he going to get in Fox?

"Ms. Stewart: Then why did you—you brought out the 21 names, which is why I objected to the relevance. And now you're—now we have an admission before the jury that he's—that he's allegedly killed all of these 21 people.

"Mr. Brown: Right. That's what we talked about up here, Tracy.

"Ms. STEWART: We didn't talk about 21. We only talked about—

"MR. BROWN: Yes, we did. That's what—that was my offer of proof with respect to Fox.

"Ms. STEWART: It's my understanding we were only going as to the six.

"THE COURT: You know, if you keep objecting, there's no way that he can get the thing in other than this way.

"Ms. STEWART: I know, but he keeps—Lopez keeps going so far beyond the question, I can't tell where he's going. But my understanding was he wasn't—

"THE COURT: What is it that you want to do now?

"Ms. STEWART: I'm making a motion for a mistrial.

"THE COURT: Overruled.

"Ms. STEWART: All right. Then as to—before we go away, I want to—

"THE COURT: I should say 'denied.' Pardon me.

"Ms. STEWART: *It was my understanding that only information as to the four here plus Wells and Miranda would be coming in through Lopez' testimony. Is that your ruling?*

"THE COURT: *That's all that I wanted to get in.* But, you know, he was asking about these and then you object; and I don't know how else he's going to get it in. This is the way it came about.

"Ms. STEWART: Well, this is why I started objecting as soon as that list came up with the 21 people because I was afraid that was going to come up.

"THE COURT: What is it you want? In other words, if you said, all right, fine, just tell them that there are six of them and he admitted that he killed all six of them, I mean, that's not the way that it went down.

"Ms. STEWART: All right. Motion to strike, at least.

"MR. BROWN: I don't think it should be stricken.

"THE COURT: I'm not going to strike it unless—unless, you know—. I don't know how I can help it. If that's the way that he admitted killing these four—

"MR. BROWN: That's the only way that you can tie the defendant's confession into Fox. . . . He never mentioned Fox' name. Bonin did not mention Fox' name.

"MS. STEWART: Well, we have an admission of 21 now.

"THE COURT: Well, in my view, the probative value of this whole line far outweighs any prejudice.

"MS. STEWART: It's—

"MR. BROWN: It's really the only evidence on Fox that ties the defendant to Fox.

"MS. STEWART: All right. Then is it the court's ruling that he can continue to refer to any—the number 21 on the list? And—

"THE COURT: This is the only thing—. As I understand it from Mr. Brown, this is the only one that we need to do that in. Fox is the only one that he didn't mention by name, as I understand it,—

"MR. BROWN: That's correct.

"THE COURT: —of our six.

"MR. BROWN: That is correct.

"THE COURT: And the only way we could tie Fox in as one of Bonin's victims is in this manner. That's my understanding of what he said.

"MR. BROWN: That's correct.

"THE COURT: Okay." (Italics added.)

Resuming his examination, the prosecutor elicited testimony that defendant admitted to the killing of Sharp, Wells, and Miranda.

At the threshold we must determine whether the claim that the prosecutor engaged in misconduct by eliciting from Lopez defendant's admission to the 14 killings not relevant to the issue of guilt is properly before this

court. ■ To preserve such a point, the defendant must generally assign the conduct in question as error at trial and request the court to instruct the jury to disregard its effect. (*People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 723 [135 Cal.Rptr. 392, 557 P.2d 976], disapproved on another point in *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Simply to object or make an assignment of misconduct without seeking a curative admonition is generally not enough. (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.'" (*People* v. *Green, supra,* at p. 27.)

As the facts stated above reveal, Defense Counsel Stewart failed to strictly comply with the requirements of the rule. But she did achieve substantial compliance: by making her motions for a mistrial and to strike the challenged portion of Lopez's testimony, Stewart effectively gave the court more than ample opportunity to "correct the abuse."

We turn now to the merits. Defendant's claim is substantial. ■ It is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony." (*People* v. *Sims* (1976) 64 Cal.App.3d 544, 554 [134 Cal.Rptr. 566]; accord, *People* v. *King* (1968) 266 Cal.App.2d 437, 464 [72 Cal.Rptr. 478], citing authorities.) ■ It appears that the prosecutor must have known that the testimony he elicited concerning the 14 other killings was inadmissible: that evidence was plainly irrelevant to the issues material to the question of guilt, and had been ruled such by the court. It also appears that the prosecutor elicited such testimony intentionally. Had it been his intent to elicit only defendant's admission to the killing of Fox, he would simply have pressed Lopez to answer the question he had already asked: "[D]id Mr. Bonin at any time indicate to you that he had . . . killed Frank Fox without using Mr. Fox' name?" Had he failed in his attempt, he could then have asked whether Fox's name appeared on the list of homicide victims and, if so, whether defendant admitted to killing him either expressly or by implication.

In response to defendant's claim, the Attorney General may be understood to argue to the following effect. "Prosecutorial misconduct," he begins in his brief, "involve[s] the resorting to the use of deceptive or reprehensible methods in an attempt to persuade the jury." No such methods, he continues, were used here: the only way that the prosecutor could elicit the admission at issue was to question Lopez as he did; moreover, the prosecutor did not violate the court's ruling—the purpose of that ruling being merely to govern how he should elicit defendant's admission to the killing of Fox, not to bar him from eliciting defendant's admission to the 14 other

killings; finally, if the prosecutor did in fact elicit inadmissible evidence, he did so unintentionally.

The Attorney General's argument is not lacking in persuasive force. It is true that not all his points are strong. For example, it is plain that the purpose of the court's ruling was not to govern the form of the prosecutor's examination: the court recognized, and declared, that the 14 other killings were not relevant to the issue of guilt. It is also plain that the prosecutor could have elicited defendant's admission to the Fox murder without eliciting his admission to the 14 other murders: we explained above how the prosecutor could have conducted his examination, and hence reject the opinion of the trial judge, who stated that the "only way [the prosecutor] could tie Fox in as one of Bonin's victims is in th[e] manner [he used]." One of the Attorney General's points, however, cannot be rejected out of hand. The record is not without support for an inference that the prosecutor may have elicited the inadmissible evidence unintentionally, having lost his concentration at a crucial point as he was questioning a hard-to-control witness.

But whether the prosecutor's examination of Lopez can be held to be misconduct is a question we need not resolve: having reviewed the record in its entirety, we have come to the conclusion that the conduct under challenge could not be deemed prejudicial. Defendant argues that the "misconduct" was so egregious as to render the trial fundamentally unfair and as such requires reversal whether or not it can be shown to have caused specific prejudice. We are not persuaded. To our mind, the "misconduct" could not properly be termed "egregious." Moreover, it constituted an isolated instance in a lengthy and otherwise well-conducted trial, and therefore could not have rendered the proceeding fundamentally unfair.

Defendant next argues that even if not prejudicial per se, the "misconduct" requires reversal under the "reasonable probability" standard of People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. Again, we are not persuaded. We recognize that in the abstract such misconduct as is claimed here could pose a not insubstantial threat of prejudice. Nevertheless, we believe that in this case the threat would not have been realized: since the evidence of guilt—albeit in large part circumstantial—was overwhelming, there is not a reasonable probability that in the absence of the "misconduct" an outcome more favorable to defendant would have resulted.[2]

---

[2]Defendant also contends that the introduction of Lopez's testimony about his admission to the 14 other killings amounted to reversible error in and of itself. The point must be rejected. The testimony, to be sure, was plainly irrelevant to the issue of guilt and as such inadmissible. But as the discussion above shows, it did not subject defendant to prejudice.

### III. SPECIAL CIRCUMSTANCE ISSUES

Defendant raises a single contention as to the validity of the special circumstance findings. ■■■ Specifically, he claims that it was error for the prosecution to allege four multiple-murder special circumstances instead of one. He is correct. As we explained in *People* v. *Anderson, supra,* 43 Cal.3d at page 1150: "The plain words of section 190.2(a)(3)—'The defendant has in this proceeding been convicted of *more than one* offense of murder'—suggest that no matter how many murder charges are tried together, they constitute a single multiple-murder special circumstance. That reading is supported by certain constitutional considerations: '. . . "alleging two special circumstances for a double murder improperly inflates the risk that the jury will arbitrarily impose the death penalty, a result also inconsistent with the constitutional requirement that the capital sentencing procedure guide and focus the jury's objective consideration of the particularized circumstances of the offense and the individual offender. [Citations.]" . . . [Accordingly,] appropriate charging papers should allege one multiple-murder special circumstance separate from the individual murder counts.' [Citation.]" It follows that three of the four multiple-murder special-circumstance findings must be vacated.

### IV. PENALTY ISSUES

Defendant makes several claims bearing on the issue of penalty. As we shall explain, none establishes reversible error.

#### A. *Refusal to Allow Two Members of Defense Team to Present Closing Argument*

■■■ Defendant contends that by refusing to allow Defense Counsel Stewart to make a closing argument the court committed error under Penal Code section 1095 (hereinafter section 1095) and in fact denied him, or at least infringed on, his constitutional right to the assistance of counsel. The facts relevant to this claim are as follows.

Prosecutor Brown delivered a closing argument. Defense Counsel Charvet then followed with a full and unrestricted argument of his own. When he finished, the following colloquy ensued in open court.

"THE COURT: Mr. Brown.

"MR. BROWN: I don't have any rebuttal.

"THE COURT: All right. May I see counsel just for a moment? If you would approach."

Thereupon the colloquy continued at the bench out of the hearing of the jury.

"THE COURT: The reason that the court is having counsel approach, it is my understanding that Miss Stewart has indicated that she was going to argue in the penalty phase and I'll be very honest with you, that I know that the law says that two counsel can argue in the penalty phase. Whether or not that would apply like where we are right now where the prosecution has not exercised its right to, in essence, rebut the argument of the defense, and I don't really know what the answer is.

"Ms. STEWART: Can I make a suggestion?

"THE COURT: Sure.

"Ms. STEWART: Since it's almost four o'clock, I could research tonight and we'll return in the morning. I can either give it or—

"MR. BROWN: Let's get it over with today.

"Ms. STEWART: I don't think I can do it that quick.

"THE COURT: What I am getting at, I don't want to put anybody at a disadvantage here. I don't want to prevent the right of the defendant to have Miss Stewart argue if he has a right to argue under these circumstances.

"MR. CHARVET: May we have five minutes just to look it up? [¶] It's my understanding and I can be wrong that we have a right to two arguments only if he exercises his right.

"THE COURT: That is the normal situation.

"Ms. STEWART: What is it, 1095, I think.

"MR. CHARVET: I think we can look it up in just a few moments.

"THE COURT: All right. Let's take a couple minutes. That may be worthwhile."

The colloquy soon concluded as follows out of the hearing of the jury.

"THE COURT: All right. The record should reflect that the court has reviewed the annotations to section 1095 of the Penal Code, and it appears to the court that the existing law prescribes that argument where you have two counsel to argue should proceed alternately. [¶] And in this particular case, inasmuch as Mr. Brown has waived his rebuttal argument, there would be no rebuttal argument provided.

"MR. CHARVET: I understand that, and it's—of course, he doesn't have to tell us, but had we known that, it would have been a different situation. But anyway—

"MR. BROWN: I told everybody.

"MR. CHARVET: —I think we can go to final argument at this point.

"MR. BROWN: I told everybody.

"MR. CHARVET: He told us, but I didn't believe him.

"THE COURT: Okay."

The court then proceeded to deliver the penalty phase instructions.

We agree with defendant that in ruling as it did the court erred. Section 1095 provides: "If the offense charged is punishable with death, two counsel on each side may argue the cause. In any other case the court may, in its discretion, restrict the argument to one counsel on each side." The statute plainly gives each side in a capital case the right to present argument by two counsel. Further, it does not require alternation of arguments or allow two counsel on one side to argue only if the other side presents two arguments.

As is revealed by a perusal of the cases collected following section 1095 in both 50A West's Annotated Penal Code (1970 ed.) at page 572 and Deering's Annotated Penal Code (1971 ed.) at page 281, the court's ruling is evidently based on the decision in *People* v. *Fair* (1872) 43 Cal. 137. *Fair,* however, does not govern the issue at bar. In holding that alternation was required, the *Fair* court merely followed section 364 of the Criminal Practice Act of 1851 (hereinafter section 364). That provision declared as follows: "If the indictment be for an offense punishable with death, two counsel on each side may argue the cause to the jury, *in which case they must do so alternately.* If it be for any other offense the Court may in its discretion restrict the argument to one counsel on each side." (Stats. 1851, ch. 29, § 364, p. 252, italics added.) Of course, the Criminal Practice Act of 1851 is no longer in effect. (Stats. of 1873, continued in force, ch. 52, § 664, p. 361.)

Hence, section 364, together with its requirement of alternation, cannot govern the question we address here.

We recognize that in light of the similarity of language section 364 should be presumed to be the source of section 1095. But we cannot infer from such a relationship that the later provision continues the requirement of alternation contained in the earlier. First, section 1095 does not impose such a requirement by its express terms. Second, it cannot reasonably be read to impose such a requirement by implication. In enacting section 1095 in the form that it did, the Legislature chose not to continue the express requirement of alternation contained in section 364. In so doing, it evidenced an intent to change the former law by removing the requirement. Hence, section 1095 must be read as lacking such a requirement.[3]

 Although we agree with defendant that the court's ruling was error, we cannot agree that it amounted to a constitutional violation as a denial of or an infringement on his right to the assistance of counsel. We recognize, of course, that the criminal defendant has a constitutional right to assistance of counsel. (U.S. Const., Amend. VI; Cal. Const., art. I, § 15.) That right "ensures to the defense in a criminal trial the opportunity to participate fully and fairly in the adversary factfinding process." (*Herring* v. *New York* (1975) 422 U.S. 853, 858 [45 L.Ed.2d 593, 598, 95 S.Ct. 2550].) We further recognize that the constitutional right to the assistance of counsel encompasses the right to have counsel present closing argument. (*Herring* v. *New York, supra,* at pp. 856-862; *In re William F.* (1974) 11 Cal.3d 249, 255 [113 Cal.Rptr. 170, 520 P.2d 986].) Nevertheless, we cannot conclude that the court's erroneous ruling effected a constitutional violation here.

First, the ruling did not amount to a denial of the constitutional right. As noted above, Defense Counsel Charvet presented a full and unrestricted argument on behalf of defendant. That Defense Counsel Stewart was not allowed to make an argument is, to our mind, constitutionally immaterial on this point: the federal and state Constitutions impliedly grant the criminal defendant the right to have *defense counsel* present closing argument, not *each member* of the defense team.

---

[3] The Attorney General argues that our decision in *People* v. *Bandhauer* (1967) 66 Cal.2d 524 [58 Cal.Rptr. 332, 426 P.2d 900], requires alternation of arguments and allows two counsel on one side to argue only if the other side presents two arguments. He is incorrect. In *Bandhauer* we did not even consider section 1095. In that case we held only that even though in criminal trials generally the prosecution opens the argument, the defendant responds, and the prosecution closes, at the penalty phase of a capital trial the defense must be given the opportunity to close with a second argument. (*Id.* at pp. 530-531.) In arriving at our conclusion, we recognized, to be sure, the practice of alternation. But we did not state or imply that two counsel on one side may be allowed to argue only if the other side presents two arguments.

Second, the ruling did not amount to an infringement of the constitutional right. ▮▮▮ In our view, the right is not infringed when "the opportunity [of the defense] to participate fully and fairly in the adversary factfinding process" (*Herring* v. *New York, supra,* 422 U.S. at p. 858 [45 L.Ed.2d at p. 598]) is not significantly limited. ▮▮▮ Here, we believe, the defense's opportunity to participate was not significantly limited: as noted above, Defense Counsel Charvet presented a full and unrestricted argument. We recognize, to be sure, that the court did not allow Defense Counsel Stewart to make an argument. But we cannot conclude that it thereby significantly limited the defense's opportunity to participate. Indeed, as the record reveals, Charvet himself apparently considered his argument to be sufficient and further argument by Stewart to be dispensable.

Defendant maintains that "The omission of Ms. Stewart's argument was critical inasmuch as she had assumed the primary defense responsibilities. . . . Her rapport with the jury was probably better than Mr. Charvet's, and her familiarity with the evidence was probably greater. This made her perspective of greater significance than Mr. Charvet's." In urging his point defendant asks us in effect to leave analysis behind and to embark on the path to speculation and conjecture. There, however, we cannot and will not go. Thus, we must reject his point.

Accordingly, we conclude that the court's ruling did not significantly limit the defense's opportunity to participate in the adversary process and hence did not infringe on defendant's constitutional right to the assistance of counsel.[4]

But even though the court's ruling did not amount to a constitutional violation, it was, as we have concluded, error under section 1095. The question to which we must now turn is whether the error was prejudicial. We believe that it was not. Of course, we do not and cannot know what Defense Counsel Stewart may have said to the jurors or whether she may have moved them or in what way. But as we have noted above, Defense Counsel Charvet apparently considered his argument to be sufficient and further argument by Stewart to be dispensable. Lacking any indication as to the nature and likely effect of Stewart's intended argument, we can do nothing other than accept Charvet's assessment. Accordingly, we are compelled to hold that under any standard of prejudice the error must be deemed harmless.[5]

---

[4] To the extent that *In re William F., supra,* 11 Cal.3d 249—a case in which no argument at all was permitted—implies that error adversely affecting defense counsel's closing argument necessarily infringes on the defendant's constitutional right to the assistance of counsel (see *id.* at p. 256, fn. 6), it is unsound and is hereby disapproved.

[5] Defendant requests that pursuant to Evidence Code sections 452, subdivision (d), and 459, we take judicial notice of the record on appeal in *People* v. *Buono* (B003499, app. pend-

B. *Claims Relating to CALJIC Nos. 8.84, 8.84.1, and 8.84.2*

Defendant makes a number of claims relating to the core penalty instructions delivered by the court. In accordance with CALJIC No. 8.84 as modified and ultimately with section 190.2 of the Penal Code (hereinafter section 190.2), the court instructed the jurors as follows. "The defendant in this case has been found guilty of four counts of murder of the first degree. The charge that each of said murders was committed under a special circumstance has been specially found to be true.

"It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which the special circumstance [*sic*] charged in this case have [*sic*] been specially found to be true.

"Under the law of this state, you must now determine which of said penalties shall be imposed on defendant as to each of the four murder convictions in this case."

In accordance with former CALJIC No. 8.84.1 as modified and ultimately with section 190.3 of the Penal Code (hereinafter section 190.3), the court then gave the following instruction to the jurors. "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable: "(a) The circumstances of the crimes of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

---

ing) and *People* v. *Maxwell* (B007390, app. pending). In support he argues that Buono and Maxwell have each been convicted of crimes as egregious as those of which he has been convicted, but have nevertheless received the penalty of life imprisonment without the possibility of parole. He then argues that the records in their cases are relevant to the issue whether any errors that occurred at the penalty phase of his trial were prejudicial. We are not persuaded. Under the modern system of capital punishment, which "require[s] a particularized inquiry into ' "the circumstances of the offense together with the character and propensities of the offender" ' " (*McCleskey* v. *Kemp* (1987) 481 U.S. 279, 302 [95 L.Ed.2d 262, 285, 107 S.Ct. 1756, 1772]), we fail to see how the record in one case can be relevant to the evaluation of prejudice in another, no matter how similar the cases appear to be. Accordingly, we are compelled to reject defendant's request.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, or any other factor offered by the defendant as a circumstance in mitigation."

Finally, in accordance with former CALJIC No. 8.84.2 as modified and ultimately with section 190.3, the court instructed the jurors in relevant part as follows.

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating

circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

### 1. *Failure to Explain "Life Imprisonment Without Possibility of Parole" Sua Sponte*

■ Defendant contends that the court erred when it failed to explain to the jury sua sponte that the phrase of CALJIC No. 8.84.2, "confinement in the state prison for life without possibility of parole," actually means what its words declare—i.e., confinement for life *without possibility of parole.* The point must be rejected.

When a term is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request. (*People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].) In this case, the term "confinement in the state prison for life without possibility of parole" was used in the common and nontechnical sense that the plain meaning of its words convey. Accordingly, the court was not required to give an instruction as to its meaning sua sponte.

Defendant argues that jurors share a "common and widespread misconception" that the sentence of "confinement in the state prison for life without possibility of parole" does not actually mean confinement for life *without possibility of parole,* and hence should be instructed on the court's own motion that "without possibility of parole" means "without possibility of parole." We are not, however, persuaded that the argument's factual premise is supported. We recognize that 10 out of the total of 204 prospective jurors examined on voir dire—none of whom was selected as a juror or alternate—may have labored under the "misconception" of which defendant speaks. But we cannot conclude from that fact—or from any other fact presented by defendant—that such a "misconception" was "common and widespread." Because we cannot accept defendant's premise, we must reject his conclusion.

### 2. *Failure to Delete Sentencing Factors Inapplicable on the Evidence*

■ Defendant contends that the court erred by instructing on all the statutory sentencing factors and by failing to delete such factors as were inapplicable on the facts of this case. We rejected a similar point in *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250], and we reject this point here.

Section 190.3, the statutory source of CALJIC No. 8.84.1, states in relevant part: "In determining the penalty, the trier of fact shall take into account any of the [specified] factors *if relevant* . . . ." (Italics added.) We read the provision (1) to direct the trier of fact to the criteria that the legislative body has determined to be significant in choosing between life and death and (2) to require the trier to consider those criteria, insofar as they are actually applicable, in making that choice. Under such a reading of the statute, all the factors are "relevant" in a broad sense: together they establish the normative framework within which the penalty determination in the individual case must constitutionally be made. Further, under such a reading only those factors that are applicable on the evidence adduced at trial are to be taken into account in the penalty determination in the individual case: the statutory provision "seems to contemplate that not all factors will be relevant in all cases and further that a factor which is not relevant to the evidence in a particular case should be disregarded." (*People v. Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861] (plur. opn.).)

Defendant argues that instructing the jurors on factors inapplicable on the evidence adduced at trial may cause them to focus on constitutionally irrelevant matters: "The focus," he maintains in words quoted from *Enmund v. Florida* (1982) 458 U.S. 782, 798 [73 L.Ed.2d 1140, 1152, 102 S.Ct. 3368], "must be on *his* culpability, . . . for [the United States Supreme Court] insist[s] on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" We do not find defendant's argument to be persuasive.

In this case, the jurors were instructed: "You shall consider, take into account and be guided by [specified] factors, *if applicable* . . . ." (Italics added.) In other words, they were directed to focus on defendant's culpability and on the evidence relevant to that issue. ■ We presume that jurors follow the court's instructions. (E.g., *Delli Paoli* v. *United States* (1957) 352 U.S. 232, 242 [1 L.Ed.2d 278, 285-286, 77 S.Ct. 294], overruled on other grounds in *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].) We are presented with no reason to believe that the jurors in this case did not follow the instruction here.

3. *Failure to Instruct That Absence of Evidence in Mitigation Does Not Establish a Factor in Aggravation*

■ Defendant contends that the court erred by failing to instruct the jury sua sponte that the absence of evidence in mitigation does not establish a factor in aggravation. The point must be rejected.

We recognize that section 190.3 impliedly provides that the trier of fact should disregard a factor that is inapplicable on the evidence adduced at trial (see pt. IV.B.2, *ante*), and that in so doing it necessarily bars the trier from considering such a factor as aggravating (see *People v. Rodriguez* (1986) 42 Cal.3d 730, 788-789 [230 Cal.Rptr. 667, 726 P.2d 113]; *People v. Davenport, supra,* 41 Cal.3d at p. 289).

We believe, however, that the court adequately instructed the jury in this regard. As we concluded above (see pt. IV.B.2, *ante*), the court properly directed the jurors to consider the sentencing factors only "if applicable." Defendant argues in substance that the court should have amplified or explained its words. But when as here the instruction under challenge is adequate, the court is under no obligation to amplify or explain in the absence of a request. (*People v. Anderson, supra,* 64 Cal.2d at p. 639.)

 Defendant may be understood to claim that the prosecutor committed misconduct by making comments in closing argument that were predicated on, and thereby communicated, an erroneous understanding of the law in this regard. The remarks under challenge were as follows.

"Going now to whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

". . . . . . . . . . . . . . . . . . . .

"There's absolutely no evidence whatsoever that the defendant was under the influence of extreme mental or emotional disturbance. *I would suggest to you on that basis that that's an aggravating factor, that he was not under the influence of emotional disturbance.*

"Item E, whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. [¶] There can be no question that neither of the four victims in this case consented to be killed by the defendant. [¶] Russell Rugh, Glen[n] Barker, we know a little bit about them. We don't know too much about Lawrence Sharp and Frank Fox. But there's no evidence whatsoever that they consented to being killed. *So that would be an aggravating factor.*

"Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. [¶] There can be no moral justification for this. This would be—at least, I can speculate that a case may come up for moral justification where you have someone dying, terminally ill of cancer or something, and

you do—you participate in a mercy-type killing or something like that. That could be moral justification. Not—nothing that we have seen here in court. *So that would also be an aggravating factor.*

"Whether or not the defendant acted under extreme duress or under the substantial domination of another person. [¶] The one that's really got that is—would be James Munro or Greg Miley. If you are prosecuting Miley or Munro here, they could probably get up and make a big whoop-de-do about that because they were under the substantial domination of the defendant, but it's not the other way around. *So that would be an aggravating factor here.* [¶] There's no evidence whatsoever that the defendant acted under duress or domination of another person.

"Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication. [¶] There's no evidence of that.

". . . . . . . . . . . . . . . . . . . . . . .

"*So with respect to the evidence concerning that particular factor, it's aggravating.* There's no evidence of mental disease or defect or intoxication. It's just the opposite.

". . . . . . . . . . . . . . . . . . . .

"Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

". . . . . . . . . . . . . . . . . . . .

". . . [T]he defendant is, there's no evidence at all that he's an accomplice. He is the force that causes all this. He is the force that seeks out Gregory Miley, the force that seeks out James Munro and turns them into killers. *So that would be an aggravating factor in this case.*" (Italics added.)

Having reviewed the matter closely, we are of the opinion that defendant's claim of prosecutorial misconduct must be rejected at the threshold. As stated above, it is settled that a defendant cannot complain on appeal of misconduct at trial unless he made a timely objection thereto and requested that the jury be instructed to disregard the improper remark. (E.g., *People v. Green, supra,* 27 Cal.3d at pp. 27-34.) In this case defendant made no objection whatever. It is true that the rule stated above does not apply in a situation in which a timely objection and admonition would not have cured

the harm. (*Ibid.*) Such a situation, however, is not present here. Accordingly, we conclude that defendant's point is not preserved for review on appeal. (See, e.g., *People* v. *Ghent, supra,* 43 Cal.3d at p. 775; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1283-1284 [232 Cal.Rptr. 849, 729 P.2d 115] (lead opn. by Grodin, J.).)

We are also of the opinion that defendant's claim must be rejected on the merits. The prosecutor's remarks, to be sure, amounted to a misstatement of the law. Though erroneous, however, they cannot be characterized as misconduct. ■ "[A] prosecutor is not guilty of misconduct because in his argument of the law to the jury, he is wrong as to the law. Misconduct occurs only where an erroneous proposition of law was argued in bad faith [citation]." (*People* v. *Meneley* (1972) 29 Cal.App.3d 41, 61 [105 Cal.Rptr. 432]; accord, *People* v. *Pineiro* (1982) 129 Cal.App.3d 915, 923 [179 Cal.Rptr. 883]; *People* v. *Calpito* (1970) 9 Cal.App.3d 212, 222 [88 Cal.Rptr. 64]; *People* v. *Jones* (1962) 205 Cal.App.2d 460, 467 [23 Cal.Rptr. 418]; *People* v. *Gould* (1959) 170 Cal.App.2d 489, 492 [338 P.2d 938].) ■ In this case evidence of bad faith is altogether lacking, and defendant makes no claim to the contrary. Hence, we find no misconduct.

But even if we could characterize the prosecutor's comments as misconduct, we could not hold that they require reversal. The court instructed the jurors to consider the sentencing factors only "if applicable" and to "accept and follow the rules of law as I state them to you." The court thereby told the jurors, in effect, to be guided by its proper statement of the law and not by the prosecutor's misstatement. As we said above, we generally presume that jurors follow the court's instructions. We are presented with no reason to believe that the jurors in this case acted contrary to that presumption. Further, having reviewed the record in its entirety, we believe that the remarks could have had no marginal effect on the balance of aggravating and mitigating factors or on the consequent determination of the appropriateness of death: under the sentencing guidelines as properly construed and applied, the factors in aggravation were overwhelming and the factors in mitigation virtually nonexistent. Accordingly, even if the prosecutor's comments amounted to misconduct, they were neutralized by the court's instructions and in any event could not be deemed prejudicial on this record.

4. *Statutory Sentencing Factor (a) and "Multiple" Multiple-murder Special Circumstances*

■ Defendant contends that the court's instruction as to statutory sentencing factor (a) was prejudicial error because it effectively directed the jurors to consider four multiple-murder special-circumstance findings instead of one. We agree that the instruction was erroneous: as we concluded

above (see pt. III, *ante*), there can be only one such finding in a proceeding. We cannot agree, however, that the error requires reversal. Although we presume that the jurors considered the invalid special-circumstance findings independent of their underlying facts, we cannot conclude that they could reasonably have given them any significant independent weight.

### 5. *The Scope of Statutory Sentencing Factor (b)*

 Defendant contends that the court's instruction as to statutory sentencing factor (b) was error. In support he argues that section 190.3 must be construed to limit the scope of that factor to crimes other than those of which the defendant was convicted in the capital proceeding. He then argues that the court's instruction failed to so limit the scope of that factor and thereby invited the jury to "double count" the circumstances of the capital offense under both factors (a) and (b).

We agree that section 190.3 should be construed to contain the limitation defendant discerns. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127].)

We cannot agree, however, that the factor (b) instruction was erroneous. In determining the meaning conveyed by an instruction, we give the charge the meaning that a reasonable juror would give. (E.g., *California* v. *Brown* (1987) 479 U.S. 538, 541 [93 L.Ed.2d 934, 940, 107 S.Ct. 837, 839].) "To determine how a reasonable juror could interpret an instruction, we 'must focus initially on the specific language challenged.' [Citation.] If the specific instruction fails . . . muster, we then review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." (*Ibid.*)

 When we focus on the specific language challenged, we are unable to conclude that "the [factor (b)] instruction per se amounts to error. As we stated in *Miranda, supra,* 44 Cal.3d 57[, 105-106,] we doubt a reasonable jury would 'double count' under [factors] (a) and (b), in the absence of misleading argument by the prosecutor inviting it to do so." (*People* v. *Kimble* (1988) 44 Cal.3d 480, 505 [244 Cal.Rptr. 148, 749 P.2d 803] [construing identical instruction under 1977 death penalty law, former Pen. Code, § 190 et seq., Stats. 1977, ch. 316, § 5 et seq., p. 1256 et seq.].) In this case there was no such misleading argument.

Nor can we conclude that the factor (b) instruction was erroneous when we review the charge in its entirety. Elsewhere in the instructions the court made it plain that factor (b) was limited to crimes other than those of which

defendant was convicted in this proceeding. Specifically, the court delivered the following charge to the jury.

*"Evidence has been introduced for the showing that the defendant* WILLIAM GEORGE BONIN *has committed the following 'criminal activity' which involved the use or attempted use of force or violence or the express or implied threat to use force or violence:* [¶] The homicide of Marcus Grabs . . .[;] [¶] The homicide of Donald Hyden . . .[;] [¶] The homicide of David Murillo . . .[;] [¶] The homicide of Charles Miranda . . .[;] [¶] The homicide of James MaCabe [*sic*] . . .[;] [¶] The homicide of Ronald Gatlin . . .[;] [¶] The homicide of Harry Todd Turner . . .[;] [¶] The homicide of Steven Wood . . .[;] [¶] The homicide of Darin Lee Kendrich [*sic*] . . .[;] [¶] The homicide of Steven Wells . . .[.] [¶] Before you may consider any of such criminal activity as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant WILLIAM GEORGE BONIN did in fact commit such criminal activities. *You may not consider any evidence of any other criminal activity as an aggravating circumstance other than those which are set forth in this instruction.*" (Italics added.)

When the factor (b) instruction is considered in connection with the foregoing instruction, no error appears: the latter properly limits the former. (See *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 787.)

### 6. Failure to Instruct on "Burden of Proof" in Determining Penalty

Defendant contends that the due process clause required the court to instruct the jurors that they might return a verdict of death only if they were persuaded beyond a reasonable doubt that the evidence in aggravation outweighed the evidence in mitigation and that death was the appropriate penalty. We rejected the substance of this claim, however, in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 778, footnote 15.

### 7. The Meaning of Statutory Sentencing Factor (i)

Defendant contends in substance that contrary to the legislative intent in forming section 190.3, the language of factor (i) of the instruction on the sentencing factors may have misled the jurors to consider his "age . . . at the time of the crime" as a circumstance in aggravation. The point is without merit.

As we recently held in *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052], "It is true that 'mere chronological age *of itself* should not be deemed an aggravating factor.' [Citations.] By the same

token, mere chronological age of itself should not be deemed a mitigating factor. Age alone is plainly 'a factor over which one can exercise no control' [citation] and as such is not relevant to the issue of penalty. . . . [¶] In our view, the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty."

Thus, we are of the opinion that the language of factor (i) of the instruction on the sentencing factors was not misleading. First, that language is identical to the relevant language of section 190.3. Second and more important, it would be understood by a reasonable juror in accordance with the interpretation of the statute set forth above. Accordingly, we hold that the court's instruction was not erroneous.[6]

8. *Brown Error*

 Defendant contends that former CALJIC No. 8.84.2, incorporating the section 190.3 mandatory sentencing language, may have misled the jurors to his prejudice as to the scope of their sentencing responsibility and discretion in violation of the constitutional principles set forth in *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California* v. *Brown, supra,* 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].

Section 190.3 states in relevant part that "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, *and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances.*" (Italics added.)

---

[6]Defendant claims in substance that the prosecutor's comments on factor (i) were improper. Those remarks were as follows.

"The age of the defendant at the time of the crime. . . . [T]he defendant was born January 8, 1947. [¶] That means, as I count anyway, that the defendant was 32 when he killed Frank Fox and was 33 when he killed Rusty Rugh, Glen[n] Barker and Lawrence Sharp. [¶] I would think if a person was very young, that might be a mitigating factor. One might want to say a young person hasn't had the opportunity to experience in life those experiences which mature a person. And he may not be responsible. We see that all the time. [¶] My kids. Whenever they step out of line, you're saying to them, 'they are not really responsible for everything they do,' because they haven't—they haven't attained the maturity or the maturation that one would have as an adult. [¶] Here again, where someone is very old, one might say that would be a mitigating factor because there may be some type of mental impairment when one gets very old. [¶] But when one is 32 and 33, I would submit to you that that's an aggravating factor. That person has lived 32 years, a little over 32 years when he killed Frank Fox. He's had all of the chances he could have, and he still chose to kill Frank Fox, chose to murder him. [¶] The age in this case I would submit to you is an aggravating factor."

Under the analysis set forth above, we believe that the prosecutor's comments were proper and accordingly reject defendant's claim.

In *Brown* we held that section 190.3, as construed therein, was not unconstitutional. (40 Cal.3d at p. 538-544.) In conformity with settled constitutional principles, we interpreted the statutory language to require jurors to make " . . . 'an individualized determination on the basis of the character of the individual and the circumstances of the crime' " (*id.* at p. 540, italics deleted) and a " ' ". . . moral assessment of [the] facts . . ." ' " (*ibid.*)—and thereby decide "which penalty is appropriate in the particular case" (*id.* at p. 541).

Although in *Brown* we upheld the constitutionality of section 190.3, we nevertheless recognized that when delivered in an instruction the provision's mandatory sentencing language might mislead jurors as to the scope of their sentencing discretion and responsibility. (40 Cal.3d at p. 544, fn. 17.) Specifically, we believed that a juror might reasonably understand that language to define the penalty determination as "simply a finding of facts" (*id.* at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale' " (*id.* at p. 541). We also believed that a juror might reasonably understand the language to require him to vote for death if he finds that the evidence in aggravation outweighs the evidence in mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544.) For this reason we directed trial courts thereafter to instruct jurors in conformity with the principles set forth therein, rather than in the bare words of the statute. (*Ibid.*) With respect to cases—such as the present—in which the jurors had been instructed in the statutory language, we announced that we would examine each such appeal on its merits to determine whether the jurors may have been misled to the defendant's prejudice. (*Ibid.*)

We turn now to the case at bar. After reviewing the record of the penalty phase in its entirety, we cannot conclude that the jurors may have been misled to defendant's prejudice by former CALJIC No. 8.84.2. We believe that they were adequately informed as to what they were to do, and how they were to proceed, in the determination of penalty, and that neither concern expressed in *Brown* was substantially implicated.

Defendant argues in effect that the prosecutor's closing argument made the potentially misleading language of former CALJIC No. 8.84.2 misleading in the context of this case. We are not persuaded.

The theme of the prosecutor's argument was that the evidence in aggravation was overwhelming and the evidence in mitigation was virtually non-existent. In other words, the theme was that the *evidence* called for the penalty of death. Such a theme, of course, does not offend the principles of *Brown*.

We recognize that in setting forth and commenting on the instructions the prosecutor made the following statement. "The applicable standard is 'shall, shall.' In other words, if you find as a group that the aggravating factors outweigh the mitigating, then the law requires that you shall return a death penalty. If you find as a group that the mitigating factors outweigh the aggravation, then you shall return a verdict of life without parole. [¶] It doesn't give any discretion once you have found the factors either aggravating or mitigating. You have to do it one way or the other once you've found that to be true."

In spite of this erroneous comment, we do not believe that the prosecutor's argument made the language of former CALJIC No. 8.84.2 misleading in the context of this case. This is so because when the argument is considered as a whole this remark was short and isolated and hence was swallowed up in the theme that the evidence called for the penalty of death. Further, the remark did not go unchallenged. Defense counsel argued: "[I]n making the decision of whether or not you intend to kill Bill Bonin or whether you intend to allow him to live really requires not just an evaluation of all of the testimony in a very rote, numerical type fashion, but it involves a lot of soul-searching because each of you is a judge and in this particular case each of you is an executioner. [¶] So you have to look individually inside of yourself and look again at the evidence that you had during the penalty phase and look at it very carefully again, then look at the evidence that was presented during the—. I mean, that was the guilt phase. I'm sorry. [¶] But then look at the evidence that was presented during the penalty phase and look very deeply for the reasons as to why a person—and in this case, Mr. Bonin as he sits there—why he should live or why he should die. And that's why we're here."

In conclusion, on this record we find no *Brown* error.[7]

9. *Instructions on Sympathy*

 Defendant contends in substance that the court erred when it failed to instruct the jurors sua sponte that they (1) could consider sympathy in

---

[7] Defendant claims in substance that in making the comment quoted above the prosecutor intended to minimize the jurors' sense of responsibility in determining penalty and that he effectively did so. To be sure, we recognize that such a remark is constitutionally objectionable. (Cf. *People v. Brown, supra,* 40 Cal.3d at pp. 538-544 [discussing the mandatory sentencing language of § 190.3].) But on the facts of this case, we cannot conclude that the prosecutor intended to minimize the jurors' sense of responsibility: as noted above, the theme of the prosecutor's argument was that the evidence called for the penalty of death, *not* that the "law" required that sanction. Nor can we conclude that the prosecutor effectively minimized the jurors' sense of responsibility: as also noted above, the comment in question was short and isolated.

choosing the appropriate penalty and (2) should not be guided by the antisympathy instruction of CALJIC No. 1.00 which was given at the guilt phase. The point must be rejected.

First, we believe that the court was not required to instruct on sympathy sua sponte. To the extent defendant argues that the jurors should have been instructed that they could indulge in sympathy unrelated to any of the evidence adduced at trial, he is unpersuasive. In *California* v. *Brown, supra,* 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], the United States Supreme Court implied that such an instruction might unchannel the jury's guided discretion by allowing it to rely "on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than for him." (*Id.* at p. 543 [93 L.Ed.2d at p. 941, 107 S.Ct. at p. 840].) It also suggested that insofar as such an instruction frees the jury to consider matters outside the record, it might frustrate "the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" (*Ibid.*) Finally, the court implied that by freeing the jury's penalty considerations from record evidence, such an instruction might undermine "the availability of meaningful judicial review, another safeguard that improves the reliability of the sentencing process." (*Ibid.*)

To the extent defendant argues that the court should have instructed the jurors sua sponte that they could consider sympathy grounded in the evidence adduced at trial, he is also unpersuasive. We believe that the jurors were adequately instructed on the point when the court told them that they could consider "any . . . factor offered by the defendant as a circumstance in mitigation." Defendant may be understood to claim that the court should have provided an amplification or explanation of these words. But in the absence of a request, it was under no obligation to do so. (*People* v. *Anderson, supra,* 64 Cal.2d at p. 639.)

Second, we believe that the court was not required to instruct the jurors sua sponte that they should not be guided by the antisympathy instruction of CALJIC No. 1.00 given at the guilt phase.

Defendant argues as follows: at the guilt phase the court told the jurors that the instructions given during that stage of the trial "apply *to this case*" (italics added), and hence might have been understood to mean that the antisympathy instruction governed the penalty phase—if such was to be had—as well as the guilt phase. We are not persuaded.

By telling the jurors that they could consider, under statutory sentencing factor (k), "any . . . factor offered by the defendant as a circumstance in mitigation," in the context of this case the court would have been under-

stood to imply that they could exercise sympathy if they believed the facts allowed them to do so. The reasons for our conclusion are two. The defense had presented background and character evidence in an attempt to minimize defendant's personal culpability and thereby arouse sympathy. Moreover, in argument defense counsel had pleaded for sympathy from the jurors, and the prosecutor had acknowledged that they could consider sympathy under statutory sentencing factor (k).

In view of the foregoing, we believe that the guilt phase, antisympathy instruction cannot be deemed to have carried over to the penalty phase. Accordingly, the court did not err by failing to caution the jurors not to be guided by that instruction. (See *People* v. *Miranda, supra,* 44 Cal.3d at p. 102; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1209 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 785-786.)[8]

## C. *Attack on the Constitutionality of the Sentence of Death*

Defendant contends that the imposition of the sentence of death was "unconstitutionally arbitrary, discriminatory, and disproportionate, considering the facts of the offense and [his] personal characteristics." He presents, however, neither evidence nor argument in support of his point. Hence, we are compelled to reject the claim as not properly raised.

## D. *Attack on the Constitutionality of the 1978 Death Penalty Law*

Defendant contends that the 1978 death penalty law is unconstitutional on various grounds. ■■■■ We rejected the substance of this claim in *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 777-779.[9]

---

[8] Defendant may be understood to contend that on the facts of this case the giving of CALJIC No. 1.00 at the guilt phase may have misled the jurors "into believing that mitigating evidence about [his] background or character . . . must be ignored" (*California* v. *Brown, supra,* 479 U.S. at pp. 545-546 [93 L.Ed.2d at p. 942, 107 S.Ct. at p. 842] (conc. opn. of O'Connor, J.)) on the ground that they were not adequately instructed that they could and should take such evidence into consideration. The argument must be rejected because its ultimate premise is false. As noted above, the jurors were expressly instructed to "consider, take into account and be guided by" specified factors and "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, *or any other factor offered by the defendant as a circumstance in mitigation.*" (Italics added.) Hence, the jurors *did* receive adequate instructions on background and character evidence.

[9] We are of the opinion that in view of the theories presented and the evidence introduced, the jury's guilt phase verdicts imply a finding that defendant actually killed, and intended to kill, the victims (*Enmund* v. *Florida, supra,* 458 U.S. at pp. 788-801 [73 L.Ed.2d at pp. 1145-1154]). Having reviewed the record in its entirety, we conclude that this finding is amply supported by the evidence and adopt it as our own. Accordingly, we hold that the imposition of the penalty of death on defendant does not violate the Eighth Amendment. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716, 106 S.Ct. 689].)

The judgment is affirmed.

Lucas, C. J., Panelli, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the result reached by the majority opinion, but respectfully object to its discussion of penalty phase issue number 3, the prosecutor's erroneous argument that the absence of mitigating evidence renders a factor aggravating.

*People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861], first established that the absence of evidence of a mitigating factors does not transform it into an aggravating factor. In the present case, tried before *Davenport,* apparently both prosecutor and defense counsel were unaware that such a rule might be established. Thus the prosecutor incorrectly argued that mitigating factors unsupported by evidence were aggravating factors, and defense counsel did not object.

The majority begin their discussion of this issue by noting that defendant's failure to object bars review of this issue, and that the prosecutor's misstatement of the law cannot be characterized as misconduct. This portion of the majority's discussion is pointless, for this court has unanimously resolved that in cases of this type it will review the merits of defendant's contention despite trial counsel's failure to object or the prosecutor's putative good faith. As we explained in *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031, footnote 15 [245 Cal.Rptr. 185, 750 P.2d 1342], "[b]ecause this case was tried before . . . *Davenport,* we do not describe the prosecutor's mistaken argument as misconduct. For the same reason, we could not treat a defense counsel's failure to object as incompetence or waiver. Our concern is not with the ethics of the prosecutor or the performance of the defense, but with the impact of the erroneous interpretation of the law on the jury."

The majority accordingly turn to the merits, but their discussion betrays a misunderstanding of the significance of the prosecutor's remarks. They conclude that since the trial court directed the jury to consider the factors only "if applicable," and since we must presume that the jury followed the instructions, we should further presume that the jurors rejected the erroneous conception urged by the prosecutor. This is nonsense. The vice of *Davenport* error is that it tells the jury that factors are applicable when as a matter of law they are not and that factors are aggravating when as a matter of law they are neutral or mitigating. Nothing in the judge's instructions would dispel such erroneous impressions. The trial judge did not tell the jurors how to determine which factors were applicable, that many factors were inapplicable, or that absence of evidence to support a mitigating factor did not transform it into an applicable aggravating factor. Consequently the

prosecutor's erroneous argument would not strike the jury as inconsistent with the instructions. We cannot presume that the jurors rejected a plausible prosecution argument and instead adopted a view advanced by neither court nor counsel.

Indeed the instructions to the jury to consider sentencing factors only "if applicable," and to follow the law as stated by the judge, are standard instructions given in all capital cases. To hold that such instructions give rise to a presumption that the jury rejected erroneous prosecution argument would give the prosecutor carte blanche to argue whatever he chose. While we have sometimes found *Davenport* error nonprejudicial, our cases have carefully analyzed the impact of the prosecutor's argument in light of the aggravating and mitigating evidence; none has presumed the absence of prejudice from form instructions. (See, e.g., *People* v. *Ghent* (1987) 43 Cal.3d 739, 775 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1284 [232 Cal.Rptr. 849, 729 P.2d 115].)

After making such an analysis, however, I agree with the majority that on the facts of this case the error was not prejudicial. Defendant was convicted of four murders in this case, and the penalty phase evidence showed his guilt of ten more. Under these circumstances, I do not believe it reasonably possible that, in the absence of the erroneous prosecution argument, the jury would have returned a different verdict. I therefore concur in the judgment of affirmance.

Arguelles, J., concurred.

Appellant's petition for a rehearing was denied October 19, 1988.